In Re Petition of LOUIS OPPENSTEIN, EUGENE BLAKE, BIRD H. McGARVEY and W. H. MOORE.

In Banc, July 22, 1921.

1. **ELECTION BALLOTS: Evidence in Criminal Prosecution: Constitutional Provision: Power of People.** The people have power, by a constitutional provision, to prohibit the use of ballots cast at an election as evidence in a criminal prosecution, and if they have so prohibited their use no argument to the effect that the Constitution should not be permitted to stand in the way of a prosecution for crime can be indulged by the courts.

2. ———: ———: ———: **Governmental Policy: Province of Courts.** The question whether election ballots can be used as evidence in a criminal prosecution was determined by the convention which framed the Constitution and by the people who adopted it, and with that policy the courts have nothing to do. The whole power of the courts in reference thereto is to decide what policy was adopted, and if the policy is written in the Constitution, whether good or bad, the courts will not displace it and substitute another.

3. ———: ———: **Secrecy.** The proposition that a simple provision in the Constitution that "elections shall be by ballot" introduces absolute secrecy, is established by the decision of the courts, the views of text-writers, and the history of the origin of voting by ballot and the nature of the evils it was intended to remedy.

4. ———: ———: ———: **One-Sided Policy.** At the time the Constitution of 1875 was adopted, it was settled beyond doubt that election by ballot meant an election by secret ballot; and the question of policy was not one-sided, but the convention made choice between policies, and the choice is expressed in Section 3 of Article VIII of the Constitution the people adopted.

5. ———: ———: **Constitutional Provision: Modification: Election by Ballot.** Words used in the Constitution cannot be modified or affected by anything outside of the Constitution; they cannot be changed by the Legislature or the courts or by any other than the people. The words of the first clause of Section 3 of Article VIII

that "all elections by the people shall be „by ballot" had a definite and settled meaning when they were written into the Constitution, and if they stood alone and unqualified by other words therein it would have to be ruled that ballots cast or counted at an election cannot be used in a criminal prosecution.

6. ———: ———: ———: **Secrecy: Removal by Numbering.** The provision in the Constitution requiring the ballots to be numbered removes the veil of secrecy to some extent, but does not destroy it entirely; it does not uncover the ballot of any voter, nor does the provision authorize any action by any one which would, of itself, disclose the character of the ballot.

7. ———: ———: ———: ———: ———: **Comparing Ballots.** Except in cases of contested elections, no permission is given by the Constitution to compare the ballots with the list of voters; and the fact that such permission is expressly given in election contests is no reason for saying that such a comparison may be made in proceedings which are not election contests, such as a criminal prosecution growing out of alleged frauds at an election.

8. ———: ———: **Election Officers: Permission to Testify: Ballots as Evidence: Wisdom.** Section 3 of Article VIII of the Constitution permits election officers to testify in judicial proceedings concerning the way in which a voter voted, but that provision has nothing to do with the use of the ballots in evidence. And the use of the ballots cannot be authorized on the theory that it is absurd to permit such secondary evidence and exclude the primary evidence, for the question is not the wisdom or consistency of the provisions, but what they declare.

9. ———: ———: **Comparison in Contests: Inapplicable to Other Proceedings.** The proviso that "in all cases of contested elections, the ballots cast may be counted, compared with the list of voters, and examined under such safeguards and regulations as may be prescribed by law," does not authorize the use of ballots in proceedings other than cases of contested elections. It has no pertinence to any proceeding except cases of election contests, and cannot be extended to such other proceeding. The proviso does not of itself expressly prohibit the use of ballots in other proceedings, yet the very fact that special provision was deemed necessary in cases of election contests makes applicable the well known canon of construction that *expressio unius exclusio alterius est.*

10. ———: ———: ———: ———: **As Interpreted by The Constitutional Convention.** That the proviso to Section 3 of Article VIII of the Constitution does not apply to judicial proceedings is further made plain by a rejection by the Constitutional Convention, by a vote

of 42 to 23, of a proposed substitute which declared that "all ballots shall be subject to inspection and examination in all cases of contested elections and judicial proceedings."

11. ——: ——: **Ballots as Evidence: Statutory Authority.**  In so far as a statute (Sec. 5403, R. S. 1919) conflicts with the Constitution it is without force, for the Legislature has, no authority to authorize what the Constitution prohibits.

12. ——: ——: ——: ——: **Primary Elections.**  Section 3 of Article VIII of the Constitution does not apply to primary elections, and the Legislature is not restrained by said section from enacting a law pertaining to them.

13. ——: ——: ——: **Exposure by Contest: Vote for Other Officers.**  Where other officers were voted for in the municipal election, and in a contest instituted for the office of mayor a comparison of the ballots with the lists of voters is being made, it is unlawful to make public how said voters voted for such other officers, and if their ballots have thereby been exposed and the veil of secrecy destroyed it would be still further unlawful to use them as evidence in a criminal prosecution.

14. ——: ——: ——: **Statutory Prohibition.**  Section 5403, Revised Statutes 1919, declaring that ballots shall "in no way be used or any information disclosed that would tend toward showing who voted any ballot," while invalid in so far as it relates to cases of election contests, is not otherwise prohibited by the Constitution, and forbids the use of ballots as evidence in a criminal prosecution.

15. ——: ——: ——: **Governmental Policy: Power of Courts.**  If the State of Missouri has tied her hands by her Constitution, it is not within the power of the courts or of the Legislature to untie them.  Furthermore, if one court can open ballot boxes in any proceeding other than an election contest, all courts can do likewise and the ballot would no longer be a secret ballot.

16. **DENIAL OF WRIT IN ANOTHER CASE.**  The denial of a writ in another similar case by merely marking the word "denied" on the application cannot be considered as overruling previous decisions.  Writs are frequently denied for reasons which do not arise out of substantive law.

## *Habeas Corpus.*

Petitioners discharged.

*Frank W. McAllister, Chas. M. Blackmar, Armwell L. Cooper* and *Edward J. Curtin* for petitioners.

(1) *Habeas corpus* is the appropriate remedy to secure discharge from custody under a judgment or order exceeding the jurisdiction of the court or which is made in violation of positive law. Sec. 1909, R. S. 1919; Ex Parte Arnold, 128 Mo. 256; In re Heffron, 179 Mo. App. 639. (2) Section 3 of Article VIII of the Constitution of Missouri is so clear and explicit that it would seem no controversy could arise as to its meaning and effect. It provides: (a) That all elections shall be by ballot; (b) That every ballot shall be numbered in the order in which it is received, and the number recorded on the list of voters, opposite the name of the voter who presents it; (c) that the election officers shall not be permitted to disclose how any voter shall have voted, unless required to do so as witnesses in a judicial proceeding; (d) That in cases of contested •elections the ballots cast may be counted, compared with the list of voters, and examined under such safeguards and regulations as may be prescribed by law. As a matter of fact, so far as the proceedings here involved are concerned, there can be no real controversy. (3) There is no sort of basis for the contention that the ballot boxes may be opened, the ballots counted or examined and compared with the list of voters, except in one particular class of cases, i. e., "cases of contested elections." (4) It is true that under the third provision the election officers may be required, in a judicial proceeding, to disclose "how any voter shall have voted," but certainly there is no suggestion in this language that the ballot boxes may be opened and the ballots counted, examined or compared with the list of voters; and without the concluding proviso of the section, the conclusion would be inevitable that the ballot boxes could not be opened in any proceeding, not even in election contests. The proviso contains the only authority for open-

ing the ballot boxes or counting or examining the ballots or comparing them with the list of voters, and the language is susceptible of no other construction than that this can only be done in cases of contested elections. (5) The Legislature was commanded to so safeguard and regulate the examination of the ballots, even in election contest cases, that their secrecy would not be thereby violated, and following this constitutional mandate, the General Assembly passed an Act in 1883 (Laws. 1883, p. 91), now Secs. 4911 to 4916, R. S. 1919, an examination of which will. clearly disclose that the Legislature understood the Constitution to mean that even in election contest cases the contents of the ballot boxes could not be made public, but the count, examination and comparison with the list of voters provided for by the Constitution was required to be made under such circumstances that the secrecy of the ballot would not be disturbed, and, therefore, it is provided that only the parties directly interested in the contest may be present when the ballot boxes are opened and the contents examined, and they are sworn "not to disclose any fact discovered from such ballots, except such as may be contained in the clerk's certificate." The enactment of some such statute providing the "safeguards" required in Section 3 was a condition precedent to the exercise of the right to count and examine the ballots and compare with the list of voters, and until such "safeguards" had been prescribed, the right could not have been exercised. State ex rel. v. Francis, 88 Mo. 557; Ex parte Arnold, 128 Mo. 256. (5) The foregoing conclusion is fully supported and its correctness demonstrated beyond any doubt by the history of Section 3 of Article VIII of the Constitution in the Constitutional Convention, now made accessible by Volume I of "Journal Missouri Constitutional Convention, 1875." It appears that the chairman of the committee on elections and electors submitted a proposed article on elections, of which Section 3 was as follows: "Section 3. All

elections by the people shall be by ballot. Every ballot voted shall be numbered in the order in which it shall be received and the number recorded by the election officers on the list of voters opposite the name of the voter who presents the ballot. The election officers shall be sworn or affirmed not to disclose how any other voter shall have voted unless required to do so as witnesses in a judicial proceeding.'' An amendment to Section 3 as reported was adopted as follows: ''Amend Section three by adding the following: 'Provided, that in all cases of contested elections, the ballots cast may be counted, compared with the list of voters and received and such safeguards and regulations as may be provided by law.' '' It will be noted that Section 3, with the above amendment, is the identical Section 3 of Article VIII of the Constitution. After the adoption of the above amendment, the following substitute for Section 3 as amended was offered: ''Strike out Section three as amended and insert in lieu thereof the following: 'All elections by the people shall be by ballot, but all ballots shall be subject to inspection and examination, in all cases of contested elections and judicial proceedings, under such proceedings, regulations and safeguards as may be provided by law.' '' The substitute was rejected by a vote of forty-two to twenty-three. A comparison of the substitute with Section 3, which was adopted, leaves no room for doubt as to the intention of the framers of the Constitution. It demonstrates that there was no thought of permitting the contents of the ballot boxes to be brought into open court as evidence in any sort of proceeding, and that they could only be opened and the ballots counted and examined and compared with the list of voters in election contest cases. (6) The contention that Sec. 5403, R. S. 1919, is valid as a legislative construction of Section 3, Article VIII, of the Constitution, is not tenable. It simply ignores the constitutional provision. It is clearly unconstitutional in its attempt to require the legal cus-

todians of the ballot boxes to produce their contents before grand juries and in court proceedings other than election contests.

*Cameron L. Orr,* Prosecuting-Attorney, for Marshal of Jackson County.

JAMES T. BLAIR, C. J.—Petitioners constitute the Board of Election Commissioners of Kansas City. They have sued out a writ of *habeas corpus* to obtain their release from custody upon a commitment for contempt because of their refusal to obey a subpoena *duces tecum* which commanded them to produce in the Criminal Court of Jackson County the original ballots, poll books, register and certificate of the result of the election in the Fifth Precinct of the Second Ward of Kansas City, used, made and certified in that precinct at the municipal election in April, 1920.

The question presented by counsel is whether the Constitution of the State permits the ballots in question to be used in evidence in the manner in which it is attempted to use them in this case. An agreed statement of facts upon one phase of the case is referred to, as for as necessary, in the opinion.

I. In the cases of this kind it is usual for the argument to be made that unless this court holds that ballots, etc., may be freely used in evidence, frauds may go unproved and election crooks go unpunished. This case is no exception to the rule. In his brief counsel says:

Constitution: Obstacle to Criminal Prosecution.

"We believe the time has come when this court should fearlessly announce that nothing shall be. permitted to stand in the way of the prosecution of a crime against the ballot-box. Unless we have honest elections, then government by the people is a farce, and it seems trite to say that no rights of an individual elector should be considered when the rights of the whole people are

assailed by false ballots or by false count and returns on the part of election officials."

The question the parties present in this case is whether the Constitution of the State permits the use in evidence of the ballots, and the like, used in an election to which the Constitution applies. Counsel does not deny, nor could it be denied, that the people have power, by constitutional provision, to prohibit their use in the manner in which counsel seeks to use them. Of course, if the people have not prohibited such use, the quoted argument has little application to the question in this case. It is, therefore, clear that what the argument in fact invites this court to do is that, if it shall find the Constitution does prohibit such use, it shall "fearlessly announce" that it will not "support the Constitution of the State" (Sec. 6, Art. XIV, Mo. Constitution) in so far as concerns Section 3 of Article VIII of that instrument. That counsel really intends that the court shall yield to this argument is beyond belief. It was doubtless but a slip of the pen which was, perhaps, induced by previous slips of other pens in like cases.

The question in this case is not what the people ought to have put into the Constitution. The question is, what does the provision mean which they did put into the Constitution?

II. When the Constitutional Convention came to the business of drafting the article on Suffrage and Elections, and the people came to the business of adopting the article the Convention had drafted, Governmental Policy: Power of Courts. then the question of policy was for consideration, and then the arguments, pro and con, were made and heard. The Convention proposed the adoption of the policy provided in Section 3 of Article VIII and the people adopted that policy when they adopted the Constitution the Convention had drafted. Good or bad, for better or for worse, it was written into the Constitution and this court

has no power to change it. The court may decide what policy was adopted, but it may not displace the policy adopted and substitute one which it or counsel may deem to be better. It may not amend the Constitution. It must apply it as the people wrote it.

III. The history of the adoption of the ballot as a method of voting has often been written. Constant repetition of argument based upon the assumption that there can be no consideration of sound policy which could support a provision for an absolutely secret Secret Ballot, will excuse some reference to the conditions and arguments which confronted the Constitutional Convention and the people on this head. The method of voting *viva voce* once prevailed in this State and elsewhere. The literature of the times, both legal and other, demonstrates that this method had resulted in coercion, corruption and intimidation, and was attended by rioting, violence and disorder. The bribe-giver had certain means of determining whether the votes he bought were cast as agreed. Employers, creditors, landlords, organizations of all kinds, could and did require employees, debtors, tenants, members and others, to vote as directed or suffer such punishment or inconvenience as the circumstances permitted. These were conditions and not theories. Discussions of them and references to literature on the subject can be found in the "Australian Ballot System," by Wigmore, published in 1889. Statesmen' became much concerned. The system of election by ballot was designed to cure these evils. The heart of the system was secrecy. There was opposition to it. The arguments made now were made then—and others as well. The new system was rapidly adopted. At the time the Convention of 1875 was held, these arguments had been developed and amplified, *pro* and *con*. The fragments of the debates in the Convention which are still available show they were considered in that body. With these arguments before it, the Convention adopted Section 3 of Article VIII.

At that time it was already settled beyond doubt that election by ballot meant an election by secret voting. There is practically no difference of opinion as to that. The history of the origin of the system precludes any other view. Counsel does not deny this. Many of the decisions are collated in 6 C. J. pp. 1173, 1174, and 9 R. C. L. secs. 64, 65, pp. 1047, 1048. Among these are found decisions of this State which, many years ago, construed the words ''election by ballot'' in entire harmony with the construction almost universally given them elsewhere.

The text-books have always announced the same doctrine Judge Cooley, whose great ability is universally esteemed, expressed himself thus:

''The system of ballot voting rests upon the idea that every elector is to be entirely at liberty to vote for whom he pleases and with what party he pleases, and that no one is to have the right, or be in a position to question his independent action, either then or at any subsequent time. The courts have held that a voter, even in the case of a contested election, cannot be compelled to disclose for whom he voted; and for the same reason we think others who may accidentaly, or by trick or artifice have acquired knowledge on the subject, should not be allowed to testify to such knowledge, or to give any information in the courts on the subject. Public policy requires that the veil of secrecy should be impenetrable, unless the voter himself voluntarily determines to lift it. His ballot is absolutely privileged, and to allow evidence of its contents when he has not waived the privilege, is to encourage trickery and fraud, and would in effect establish this remarkable anomaly, that, while the law, from motives of public policy, establishes the secret ballot with a view to conceal the elector's actions, it at the same time encourages a system of espionage, by means of which the veil of secrecy may be penetrated and the voter's action disclosed to the public.'' [Cooley on Constitutional Limitations (17 Ed.), pp. 912, 913.]

Numerous decisions support this text.   This language is quoted and approved in McCrary on Elections (4 Ed.) secs. 488, 489.

In People v. Cicott, 16 Mich 1. c. 312, Christiancy, J., with whom Cooley, C. J., and Graves, J., concurred, said:

"The object of this requirement (that all votes 'be given by ballot'), when considered with reference to the history of our country and the whole theory of popular governments, is too plain to be misunderstood.   It was to secure the entire independence of the electors, to enable them to vote according to their own individual convictions of right and duty, without fear of giving offense or exciting the hostility of others.   And with this view the right is secured to every voter of concealing from all others, or from such of them as he may choose, the nature  of his vote, or for what person or party he may have voted.   This important object, vital as I think it is in our system of government, would be substantially defeated if the voter could be compelled to disclose even in a court of justice, how he has voted. The Constitution and our statutes which have followed out its spirit, have thrown over the voter an impenetrable shield, under which he may keep the secret of his vote until he shall see fit to disclose it.  .  .  .   How an elector may have voted is, under the Constitution and the law, a fact which no man has a right to learn, in this or any other manner, till the elector himself may choose to make it public."

The proposition, then, that a simple provision that "election shall be by ballot" introduces absolute secrecy, is established by the decisions of the courts, the view of the text-writers, the history of the origin of voting by ballot and the nature of the evils it was intended to remedy, and is not questioned by counsel for respondent, as we understand him.   Further, as this court long ago pointed out, the people who adopted our Constitution and who have the power to amend or revise it, or adopt another in its stead, have not by any of these methods

indicated dissatisfaction with Section 3 of Article VIII, as construed by this and (like provisions) practically all other courts of the country.

IV. These principles were before the Convention and the people when the Constitution of 1875 was adopted. It is therefore apparent that the question of policy was not a one-sided one as the argument of coun-

One-Sided Policy.

sel in this case seems to assume. It was between policies that the Convention and the people were called upon to choose. They did choose and their choice is expressed in Section 3 of Article VIII. When the meaning of that section is determined, this case is decided.

V. The first clause in Section 3 of Article VIII is that "all elections by the people shall be by ballot." As already pointed out, these words, at the time they were written into our Constitution, had a definite and

Modification.

settled meaning. If they stood alone and unqualified, there could be no question about their meaning, and petitioners' position would have to be sustained without further ado. It is also true that the meaning of the quoted words cannot be held to be modified or affected by anything outside of the Constitution. The Constitution cannot be changed by the Legislature or the courts or any other than the people who adopted it. It is useless labor, therefore, to look elsewhere than in the Constitution for the modifications of the quoted clause which, respondent's counsel contends, so qualify it as to justify the restraint of petitioners.

(1) It is urged, since the Constitution requires the ballots to be numbered, that the ballot it prescribes is no longer a secret ballot, and, therefore, the ballot of any and all voters may be examined at will.

Numbering Ballots.

Cases are cited. These are decisions from states in which the constitutional provisions

in force merely provided that "elections shall be by ballot" or "by secret ballot," and in which the Legislature attempted to require that the ballots be numbered so that the ballot of any voter might be identified. [Williams v. Stein, 38 Ind. 1. c. 91; Brisbin v. Cleary, 26 Minn. 107; Ritchie v. Richards, 14 Utah, 373 et seq.] These decisions are that elections by ballot necessarily mean elections by secret ballot, and that the Legislature may not provide a means whereby the secrecy secured by the Constitution may be invaded; and that numbering and listing the ballots may not constitutionally be required under such provision. These decisions do not support the contention counsel makes. As heretofore pointed out by this court, the provision in Section 3 of Article VIII, that ballots must be numbered, "of course removes the veil of secrecy to some extent" but in no wise destroys it entirely. [Ex parte Arnold, 128 Mo. 256.] The provision for numbering has its uses in election contests as the section expressly provides. The mere numbering of the ballots does not, of itself, in fact uncover the ballot of any voter; nor does that provision authorize any action by any one which would, of itself, disclose the character of any ballot. Except in cases of contested elections, no permission is given to compare the ballots with the list of voters. The fact that such permission is expressly given in election contests is certainly not any reason for saying that such a comparison may be made in proceedings which are not election contests. This exception in Section 3 in no way aids respondent.

Election Contests.

(2) Section 3 of Article VIII permits election officers to testify in judicial proceedings, concerning the way in which a voter voted. It has been suggested that it is absurd to think that the Constitution would permit secondary evidence and exclude the primary evidence, the ballots. The question is not the wisdom or consistency of what was done. The question is, what was done? It

Election Officers: Permission to Testify.

289 Mo.—28

is clear that the permission to testify has nothing to do with the use of the ballots in evidence. It is merely an exception to the provision that election officers shall not disclose how any voter voted. The exception permits them to testify and permits that only. When due consideration is given what was before the convention, the idea that this provision is absurd does not seem to be established as correct.

(3) It is contended that the proviso that "in all cases of contested elections, the ballots cast may be counted, compared with the list of voters, and examined under such safeguards and regulations as Proviso Concerning Contests. may be prescribed by law," in some way aids the argument that the ballots may be put in evidence in proceedings other than contested elections. This finally resolves itself into an argument that the quoted proviso does not limit the use of the ballots to cases of contested elections. Even if true, this could not aid respondent. The question is not whether this proviso itself limits the use of the ballots to contested election cases. Rather, it is whether the proviso extends the use of the ballots to proceedings other than contested elections. The limitation is found in other words of the section. It is too clear for argument that the proviso has no pertinence to any proceeding except cases of election contests. Upon this question People v. Londoner, 13 Colo. 303, is cited. That decision is chiefly concerned with the question whether *quo warranto* could be employed to determine who had been elected to office. It was held the proceeding was authorized. With the greatest respect for the learned court which rendered that decision, we find our own decisions out of harmony with its principal ruling in the Londoner case, and in harmony with the weight of authority elsewhere. [State ex rel. v. Francis, 88 Mo. 557. See note to State v. Ross, 245 Mo. 36, in Annotated Cases 1913E, p. 982 et seq.] In the portion of the decision upon which respondent relies, it is held that:

"The declaration in Section 8, Article 7, of the Constitution, that the ballots may be examined in contested elections, does not limit their examination to such proceedings. The right mentioned has always been freely exercised in *quo warranto,* which is the common law method of inquiring into election frauds. And the purpose of this provision was to give, in the election contests authorized by Section 12 of the same article already considered, the privilege of inspecting ballots; not to withdraw it from the proceeding in which theretofore it had been universally exercised. The leading object of Section 8 was to preserve the purity of the ballot by insuring its secrecy; but lest the language indicating this intent should be carried too far, and become the means of perpetrating fraud, the privilege in question was carefully extended to election contests in which, perhaps, it might otherwise have been challenged."

It is apparent that the court was deciding the question whether the provision for comparing the ballots with the lists of voters in contested election cases, itself prevented such comparison in other cases. That it does not do so is clear enough, as we have already pointed out. That is not the question here. In this case the question is whether the proviso with respect to contested elections *authorizes* the use of the ballots in proceedings other than contested elections. The learned court which decided the Londoner Case did not approach the question from that angle. Counsel seem to have assumed that the proviso respecting contested elections in Colorado was the sole restriction which could be relied upon to prevent the use of the ballots in *quo warranto* proceedings. That contention the court answered, but that answer is not relevant to the question before us. Again, though the provisos respecting contested elections in Section 3 of Article VIII and in Section 8 of Article VII of the Constitution of Colorado, do not of themselves expressly and in terms prohibit the use of the ballots in other proceedings, yet the very fact that special provision was

deemed necessary in the case of contested elections makes applicable the well known canon of construction "*expressio unius, exclusio alterius.*" [Ex parte Arnold, 128 Mo. l. c. 263, 264.] The effect of this rule is not discussed in the Londoner Case. This makes it still more apparent that the court was not called on by the briefs to consider a contention like that made here.

VI. It is argued that the decision in Gantt v. Brown, 238 Mo. 560, authorizes the use of the ballots, poll books, etc., in the trial of a criminal case. It is obvious that this is not a correct construction of that decision. No such question was before this court

Gantt v. Brown.

in that case. It is a poor compliment to our brethren then upon this bench to attribute to them an effort to decide a question in no wise presented by the record before them. That case dealt with an election contest and considered the meaning of the proviso to Section 3 of Article VIII of the Constitution, which proviso expressly provides that in "all cases of contested elections the ballots cast may be counted, compared with the list of voters, and examined under such safeguards as may be prescribed by law." That the question in that case has no analogy to that presented by this record, is beyond cavil. The learned writer of the opinion in Gantt v. Brown concurred in the opinion In Re Feinstein, in which the inapplicability of the decision to a case somewhat like this is pointed out. In the concurring opinion of LAMM, J. (in which a majority concurred), in Gantt v. Brown, 238 Mo. l. c. 581, that learned jurist summed up the holding thus: "Our ruling does not mean that the secrecy of the ballot should be exposed *except in so far as it may be absolutely necessary under the allegation of the pleadings in an election contest, to show fraud, if any, and to that extent* neither the Constitution nor the statutes protects the secrecy of the ballot."

That this court in that case had no idea it was passing upon any question save that pertaining to contested

elections is obvious from the record it had before it, the language of the opinion and the rule it announced, and by the subsequent course of the judges who participated in that decision. The case of Gantt v. Brown has no relevancy to the question counsel present in this case.

VII. The Constitutional Convention, after having put Section 3 of Article VIII in the form in which it now stands, had before it the question of striking out that section and adopting the following: ''All *Proposed Substitute.* elections by the people shall be by ballot, but all ballots shall be subject to inspection and examination, in all cases of contested elections and judicial proceedings, under such proceedings, regulations and safeguards as may be provided by law.''

This substitute was rejected by a vote of 42 to 23. Three members were absent. The power to inspect and examine the ballots in ''judicial proceedings'' would have been given by this amendment. The Convention rejected it.

It is clear from this that the Constitutional Convention had before it, in the proposed substitute section, the very question which counsel discuss. This substitute would have expressly given the authority now sought to be exerted. When the Convention defeated it, it passed upon the question in this case. Its intent could hardly have been more clearly exhibited than by the vote upon the substitute section.

VIII. The decision In re Massey, 45 Fed. (D. C.) 629, is cited. In that case the question was ''whether by the Act of Congress and the laws of the State of Arkansas, the custodian of ballots cast, at an *Federal Authority.* election held for members of Congress, pursuant to said laws, may be compelled by a Federal court, in administration of the criminal law of the United States, to produce the ballots cast at said election, or not.'' After stating the question, thus, the learned district judge held the Federal law was, in

such a case, paramount and that restrictions upon free-dom of action under it could not be imposed by the State. As he remarks, he might well have left the matter there as decided by the principle he had laid down. Neverthe-less, he proceeded to discuss the question whether the laws of Arkansas made any provision which would per-mit the examination of the ballots in a case to which those laws applied. With great respect, we do not deem this part of the opinion deserving of great weight in the question in the instant case. First, it is clearly and admittedly *obiter;* second, it reaches a conclusion as to the construction of a law of a state which is in conflict with the construction of that law placed upon it by the highest court of that state; third, the learned judge obviously goes into the discussion of what the law should be, of what the *proper* policy is, rather than into the question of what the law means, i. e., what policy the state had adopted.

IX.   Section 5403, Revised Statutes 1919, is cited. It is, of course, not contended by counsel that this sec-tion can be held to give authority which is denied by the Constitution.   In so far as it conflicts with the Con-

Statute.   stitution it is without force in this case.   The Legislature had no power to authorize what the Constitution prohibits.   This is not a primary elec-tion case.   With respect to such elections the Legislature is not restrained by the Constitution, since Section 3 of Article VIII does not apply to them.

X.      It is said that in an election contest in Kansas City the list of voters was made and the respective numbers of the ballots cast were shown in connection with the names on this list, and that it was also shown for whom each voter voted and that all this is on file in

Votes for   the office of the Circuit Clerk of Jackson County. Other   It is argued that these facts show that the bal-Officers.   lots have already been exposed and that "the veil of secrecy has been destroyed and there

· is now no foundation for the contention that the ballots of any precinct, so exposed in the election contest, should not be produced in evidence." The agreed statement of facts shows that the contest referred to affects the office of mayor only. The ballots listed seem to have been those cast for contestant in that case. Many other officers were voted for and against in that election. The lists show what ballots were cast for contestant in the mayoralty race and who cast them. They could not legally have included a showing as to officers other than mayor. The only votes which lawfully could have been reported upon and made public in the contest case are those for mayor. The examination of ballots, in so far as they affect one race for office, which lawfully may be counted and compared with the list of voters in an election contest, in no wise authorizes the making public of the way in which those who cast such ballots voted on other offices. Further, if the votes pertaining to races other than that for mayor were unlawfully made public, this unlawful act would not justify another violation of the Constitution in this proceeding. This is too clear to require argument.

XI. While Section 5403, Revised Statutes 1919, in so far as it conflicts with the Constitution, is inapplicable to ballots cast at an election which is such in a constitutional sense, it is entirely general in Statutory Prohibition. its terms and applies to all ballots except to the extent to which the Constitution prevents such application. There is nothing in Section 3 of Article VIII which prohibits the Legislature from enacting that the ballots shall not be used in evidence in proceedings other than contested election cases. Therefore even though it could be held that the Constitution did not prevent the use of the ballots in this case in the way in which it is sought to use them, still the effect of Section 5403 would have to be considered. That section, among other things, provides that the ballots shall "in no way be used or any information disclosed that would

tend toward showing who voted any ballot."

In this case it is proposed to bring into court and use in evidence ballots of which, as shown by the agreed statement of facts, the numbers and names of the voters who cast the particular ballots are already on file in the office of the Circuit Clerk of Jackson County. This record in the clerk's office, respondent insists, is a public record. To say that the use of the ballots in evidence would not, in these circumstances, "tend toward showing who voted any ballot" would require some hardihood. The statute prohibits their use.

XII. State ex rel. v. Kinsey (No. 18035), which was referred to in State ex rel. Feinstein v. Hartman (No. 22,572), is not cited by respondent in this case. In the Feinstein Case enough was said of State ex rel. v. Kinsey to show that it was inapplicable in that case. There was no occasion to go further at that time. In this case it is sufficient to say that in the Kinsey Case the application for the writ was disposed of without opinion and that it nowhere appears what reason moved the court to deny the writ for which application was made. It is quite certain that the court could hardly be thought to have intended to overrule any of the previous decisions by merely marking an application for a writ "denied." It would be a remarkable departure from its customary practice if it did so intend. It is quite as certain that it did not intend to decide anything which would contravene the Constitution. It would have done both had it intended its action in denying the writ to be interpreted as counsel interpreted it in the Feinstein Case. Writs are frequently denied for reasons which do not arise out of substantive law.

*Denial of Writ in Another Case.*

XIII. Nearly all the arguments advanced by respondent have been considered heretofore by this court in decisions cited in previous paragraphs. To some extent we have reconsidered these and given expression to

our views upon them. If, as said in State ex rel. v. Francis, supra, the State of Missouri has tied her own hands, the court is not empowered to undo what she has done. Also, as said in Ex parte Arnold, supra, if one court may open the ballot boxes, then all courts may do so and the ballot no longer is a secret ballot. So far as concerns the question urged by respondent, the people have chosen the policy they desired. They had full power to choose. Courts and Legislature must abide by that choice.

The petitioners are discharged from custody. All concur, except *Higbee* and *D. E. Blair, JJ.*, who dissent.