STATE OF MISSOURI on the information of ROY McKITTRICK, Attorney-General, Relator, v. WALLER W. GRAVES, Prosecuting Attorney of Jackson County.—144 S. W. (2d) 91.

Court en Banc, November 9, 1940.

992

*Roy McKittrick*, Attorney-General, *J. E. Taylor* and *Robert L. Hyder*, Assistant Attorneys General, for relator.

994

*John G. Madden, James E. Burke, Jacob Brown* and *Madden, Freeman & Madden* for respondent.

HAYS, J.—Original action in *quo warranto* commenced by the attorney general filing an information on May 10, 1939, by which he seeks to oust the respondent from the office of Prosecuting Attorney of Jackson County. After the respondent filed answer to amended information we appointed a special commissioner to hear the evidence and report his findings of fact and conclusions of law. The commissioner, so appointed, has filed his report finding that the respondent has forfeited his office through failure to perform the duties thereof and recommending that a judgment of ouster be entered. Respondent excepts to this report.

The evidence discloses that the respondent served as Prosecuting Attorney of Jackson County for two terms from 1935 to 1938. In the latter year he was elected for a third term which he is now serving and which commenced January 1, 1939, and would in the ordinary course of events terminate December 31, 1940. The amended information charges three classes of alleged misconduct of respondent: (1) failure to enforce the laws against gambling, prostitution and illegal sale of intoxicating liquor; (2) the wilful and corrupt entering of *nolle prosequi* in certain criminal cases in which, according to the relator, there was ample evidence to warrant further prosecution; and (3) failure to prosecute persons guilty of violation of election laws.

A considerable amount of evidence was received by the commissioner, over the objection of respondent, as to alleged acts and omissions of respondent during the two terms of office which preceded his present term. In his report the commissioner reached the conclusion that an order of ouster cannot be based upon misconduct alleged to have occurred during a former term of the respondent officer. His recommendation of removal is therefore based exclusively upon evidence of occurrences during the respondent's present term. Respondent contends that evidence of occurrences during previous terms should not have been received at all; while relator assumes the position that respondent might be ousted for misconduct in office before

his present term commenced. The case of State ex inf. McKittrick v. Wymore, 345 Mo. 169, 132 S. W. (2d) 979, differs somewhat on the facts from the present case. There the information was filed by the attorney general during one term of office of the respondent and alleged misconduct during such term. The proceeding was not brought to final judgment, however, until after that term had expired and respondent had commenced a new term after reelection. We held that the question of respondent's misconduct was not a moot one and that the case could proceed to final judgment even during the second term; but we recognized that a division of authority existed on the question of whether an officer could be ousted from his second term because of misconduct arising during his first term. [See Annotation, 17 A. L. R. 285.] And we expressly declined to pass upon such question since it was not necessarily involved under the facts of that case. Since the commissioner in the present case has based his findings and recommendation solely upon misconduct of the respondent taking place during the present term, it is again unnecessary to decide the proposition insisted upon by the attorney general.

█ There was considerable evidence adduced by the relator to show that during the period from January 1, 1939, to the date of the filing of the information the operation of public gambling houses was widespread throughout Kansas City. These establishments, some of them operated in connection with night clubs and restaurants, were open day and night. No special introduction or password was necessary to gain admittance and anyone who desired was permitted to participate in the gambling. There was similar evidence to the effect that in a large number of establishments in the downtown metropolitan area of Kansas City and elsewhere the laws in regard to the sale of intoxicating liquor were openly and flagrantly violated, and that houses of prostitution were maintained whose inmates often frequented the streets openly soliciting men who were passing by. The evidence as to the existence of these conditions came from eyewitnesses.

There was also a considerable amount of evidence introduced over respondent's objection to the effect that these conditions had existed all during the prior terms of respondent and particularly during the year 1938. Even though the reception of evidence were error it would not require the recommittal of the case to the commissioner since we are at liberty to disregard any evidence which we consider incompetent and since we are not bound by the commissioner's findings. But we consider that the evidence so adduced was competent and proper. Any offenses against the laws regarding gambling are felonies. [See for example Section 4287, R. S. Mo. 1929.] Persons who are guilty of such offenses are liable to prosecution within a period of three years after the commission of the offense. [Section

3392, R. S. Mo. 1929.] Even in the case of misdemeanor the Statute of Limitations does not run until one year after the date of the violation. [Section 3393, R. S. Mo. 1929.] Assume for the purpose of argument that the open and flagrant violations of law mentioned had taken place during the year 1938 and respondent, having knowledge thereof, refused to prosecute the same after the inception of his present term of office, and while these offenses were, as yet, not barred by limitation. This, in itself, would constitute a failure or refusal to perform his duties under the law which, under Section 11202, R. S. Mo. 1929, would cause the forfeiture of his office, and such wrongful refusal to prosecute would be a continuing offense on the part of respondent repeated every day until the Statute of Limitations had run. Thus under the assumption made, neglect causing forfeiture would occur during the present term of office.

Furthermore in order to establish the existence of a given condition on one date (here during the early part of 1939), it is proper to show the existence of similar conditions during a prior period, particularly when the evidence tends to establish the continuity of the condition down to the date at issue and where the circumstances are not shown to have changed in the meanwhile. The evidence here of conditions of widespread law violation existing throughout the year 1938 and until the beginning of respondent's present term was clearly competent in connection with similar evidence referring to 1939 to establish the further continuance of such condition.

Respondent claims that he had no actual personal knowledge of the existence of these conditions of law violation. In this connection he places great stress upon the language of Section 11202, which refers to an officer who "*knowingly or willfully* fails or refuses to do or perform" his duty under the law, and he contends that this language refers to actual personal knowledge as distinguished from mere constructive knowledge. There are numerous instances in our law where civil or criminal liability for the doing or omission of an act is conditioned upon the knowledge of certain facts by the actor. The tendency of the law in civil cases seems to have been toward the applying of an external standard here. That is, the individual is held to know those facts which under the circumstances an ordinary reasonable and prudent man would have known. [Holmes, The Common Law, Ch. 4.] But even in those cases where it is said that actual knowledge must be shown, the existence of such knowledge may be proven by circumstantial evidence. Thus in a prosecution for receiving stolen goods, actual *scienter* is a part of the *corpus delicti*. [State v. Ebbeler, 283 Mo. 57, 222 S. W. 396.] But a conviction may be sustained upon proof of the existence of circumstances within the knowledge of the defendant from which an ordinary prudent man would have inferred that the goods involved were stolen. [State v. Goldblat, 50 Mo. App. 186; Blumenthal v. State, 121 Ga. 477, 49 S. E. 597.]

In the Wymore case, supra, upon a state of facts strikingly similar to those in the present case, we said: ''We have ruled that evidence of the notoriety of an existing fact is admissible to prove that another has knowledge of the fact,'' citing Crane v. Missouri Pacific Ry. Co., 87 Mo. 588, Conover v. Berdine, 69 Mo. 125, 33 Am. Rep. 496, and Reilly v. The Hannibal & St. Joseph Railroad Co., 94 Mo. 600, 7 S. W. 407. Numerous cases are cited by the respondent from other jurisdictions to establish his contention, but we do not understand them to go so far as to hold that guilty knowledge may not be shown by circumstantial evidence. Insofar as any of them do so hold, they are contrary to our decision in the Wymore case, supra, and we see no reason now to modify the position there taken.

In addition to proof of the open and flagrant character of the law violations here involved, from which the inference of general public knowledge thereof is irresistible, relator over the objection of respondent introduced a series of over fifty newspaper articles appearing in the Metropolitan Press of Kansas City concerning the widespread character of gambling and similar law violation in that community. Several of these articles listed specific places where violations were occurring, and others were illustrated by the photographs of the places involved. Respondent admitted that he subscribed to two of the newspapers during the entire period. Of course these newspaper articles would be inadmissible for the purpose of showing the truth of the statements therein contained. On the other hand they were admissible to show the general notoriety of the conditions described and thereby bring home notice thereof to the respondent. [Wigmore on Evidence (2 Ed.), sec. 1789.] We ruled the exact point in the Wymore case, supra. That the existence of this long series of newspaper articles in the Metropolitan Press of his city and in papers to which he subscribed completely escaped the notice of respondent is past belief.

Yet the record clearly shows that respondent made no bona fide effort to investigate these conditions or to institute proceedings to combat the evils described. His attitude seems to have been one of waiting for some other officer or private citizen to file a formal complaint upon which he could base criminal informations.

The commissioner has found no facts tending to sustain the charge in the information that respondent was guilty of corrupt practice in dismissing criminal proceedings pending in the courts of his county. True the record of a large number of orders of nolle prosequi entered by respondent (all of them, it may be said, occurring during previous terms of office) was introduced. In some of the cases respondent's assistants concluded that the evidence was insufficient to warrant further prosecution. In at least one case respondent was convinced that a confession upon which the prosecution was based had been extorted from the prisoner by third degree

methods—a practice which cannot be too strongly condemned. The commissioner found that in no case is the existence of any corrupt motive on the part of respondent in connection with these dismissals shown. Hence they lay within his discretion under the power of *nolle prosequi* which the law vests in the prosecuting officer in the absence of a statute on the subject. [14 American Jurisprudence, 967.]

But, as we held in the Wymore case, supra, a prosecuting attorney has no arbitrary discretion. Among the cases above referred to as improperly dismissed was the case of State against Gargotta.

An indictment was returned in 1933 against Gargotta charging him with assault to kill Bash with malice aforethought. Mr. Bash was at that time the Sheriff of Jackson County. This occurrence was prior to the respondent's appointment to the office of prosecuting attorney. The case was postponed at various times until the respondent became prosecuting attorney in the latter part of December, 1933. It was thereafter reset and continued from time to time until December 19, 1938, when it was dismissed "at the request of the prosecuting attorney," and the defendant was discharged. Gargotta was again indicted for this same offense in an indictment signed by the attorney general and returned March 4, 1939. The defendant entered a plea of guilty and was sentenced to three years' imprisonment in the penitentiary. It appears that in the same affair at which the assault charge grew a man was killed. Gargotta was tried for murder and acquitted.

The respondent's explanation of the repeated delays in the Gargotta case is, in substance, that in view of the acquittal in the murder case, unless more evidence could be developed a conviction could not be expected in the assault case; that one of the two parties connected with the affray had never been apprehended and that, while keeping the case on the docket, respondent thought perhaps that during the course of the various delays this party, or these parties might be apprehended and additional evidence discovered; that Mr. Bash would not say that he *knew* Gargotta was shooting at him.

Mr. Bash testified in this proceeding to the facts and circumstances of the shooting, and that he certainly thought that Gargotta was shooting at him. The commissioner drew the conclusion that: "It is difficult to see what more he (Bash) could have done than to tell what happened, and that based on what happened he thought the man was shooting at him. It would have been for a trial jury to say whether the defendant was in fact shooting at Mr. Bash or not. That Gargotta himself had less confidence in the State's inability to make a case against him than the respondent had is self-evident from his plea of guilty when he was reindicted," and we so think.

We also sustain, on principles applied hereinafter, the commissioner's finding that these dismissals give color and characterization to

respondent's acts during his present term. It seems to me that the dismissal of the Gargotta case was, to say the least, a glaring mistake, as now appears. The lack of courage evidenced thereby may be mildly expressed in the following stanza:

"He either fears his fate too much,
Or his deserts are small,
That dares not put it to the touch .
To gain or lose it all."

The third charge made against respondent has to do with his failure to prosecute persons alleged to have been guilty of fraud in connection with the general election in 1936. While such alleged violations of the election laws occurred, if they did occur, during respondent's former term of office, the Statute of Limitations thereon had not run until November, 1939. So that respondent's failure to take action, if such failure were shown, occurred after the commencement of his present term.

The record discloses that a grand jury of the District Court of the United States for the Western District of Missouri returned a large number of indictments in which over two hundred individuals were charged with fraudulent and otherwise illegal conduct in connection with the 1936 election. It is also shown that many of the defendants so charged pleaded guilty, thus admitting the truth of the charges against them. Respondent contends that the introduction of this evidence was improper and that it does not tend to prove that the election laws were actually violated. While the mere indictments themselves are of course no evidence of the guilt of the defendants there charged, the pleas of guilty of such defendants constituted admissions against their interests. They were solemn confessions of guilt voluntarily made in open court and, as such, constitute the best possible evidence of the guilt of the persons entering the pleas. They clearly show that frauds and irregularities on a wide scale existed in connection with the 1936 election, and the existence of these facts which were well known to the respondent certainly required an investigation on his behalf. Yet, by his own admission, respondent made no such investigation. He did not even choose to discuss the matter with the Federal prosecutor. We take judicial notice of the fact that at the election of 1936, in addition to the election of numerous Federal officers, State officers were also elected. While violations in regard to the election of Federal officers lay within the jurisdiction of the courts of the United States, those which affected the election of State officers were within the jurisdiction of the State.

Respondent seeks to justify his refusal to investigate these election irregularities on several grounds. In the first place he says that the ballots cast at said election had been impounded by order of the District Court and that subsequently a rule was obtained from the Circuit Court of Appeals requiring such exhibits to be delivered to

its clerk in accordance with the recognized Federal appellate procedure. But it is certainly true that as a matter of comity the Federal courts might have temporarily released these exhibits for use in the State investigation. At any rate it seems highly probable that the Federal courts would have permitted their inspection by respondent. But respondent admittedly made no application to either the District Court or the Circuit Court of Appeals for such permission to use or to examine the exhibits. In any event some investigation could have been made even without the use of the ballots. Respondent did nothing.

Respondent says that the judges of the district court had made an order eliminating residents of Kansas City from the jury list for the trial of these cases upon the ground that the citizens of that community were so prejudiced against these prosecutions that they could not be fair jurors. Respondent then contends that since it would have been necessary for him to try any cases which he filed before Kansas City juries, the institution of prosecutions by him would have been futile. We are not in a position to say whether or not such a condition of prejudice did exist in Jackson County; but, even if it did, it would not excuse complete inactivity on the part of the prosecuting attorney. Probably every prosecutor has been confronted at times with a situation where juries are prejudiced against some species of prosecution. But the fact that jurors refuse to do their duty does not relieve the prosecutor of the responsibility of doing that which the law requires of him.

Respondent contends that activity on his part in connection with these election cases would. have hampered the work of the Federal authorities. It is difficult to see just how an investigation by respondent would have interfered with the work of the district attorney. Certainly no such interference would exist had the matter been approached in that spirit of harmony and cooperation which should exist between the officers of the State and those of the nation. But respondent did not consult with the district attorney to determine whether activity on his part would hamper the work of the Federal authorities.

Finally respondent says that these defendants had been once prosecuted in the Federal court and should not thereafter be prosecuted in the courts of the State for the same acts, even though those acts might constitute crimes against both the nation and the State. Under these circumstances a prosecution in the Federal courts does not bar a subsequent prosecution by the State. [Herbert v. Louisiana, 272 U. S. 312, 47 Sup. Ct. 103, 71 L. Ed. 270; Ex parte January (Mo.), 246 S. W. 241.] On the other hand we agree with respondent that under ordinary circumstances such a double prosecution is inequitable. [United States v. Amy, Federal Case No. 14,445; United States v. Palan, 167 Fed. 991.] However, it is not at all certain that

all of the persons guilty of election violations were vulnerable to Federal prosecution. In fact it is reasonable to infer that where such widespread and general irregularities in an election existed, many cases would exist where prosecution by the State was alone possible. Certainly the conditions demanded that respondent make a *bona fide* effort to determine whether or not this was true, but again we see he did literally nothing. He neither undertook any investigation on his own behalf nor counseled with the office of the district attorney and the other Federal authorities.

 Respondent says that the ballots cast at the 1936 election were legally nonexistent after November, 1937, citing In re Oppenstein, 289 Mo. 421, 233 S. W. 440, and State ex rel. v. O'Malley, 342 Mo. 641, 117 S. W. (2d) 319; but those cases do not hold that no prosecution for felonious violations of the election law could not be brought more than a year after the acts complained of occurred. And even though the ballots themselves should not be admissible after the end of the year in a criminal prosecution, still other evidence could have been obtained upon which to base such prosecutions. But respondent did not attempt to obtain it.

 In connection with the charge that he failed to prosecute gambling and also in connection with the charge having to do with the election law violations, respondent says that it was not his duty to play the part of a detective. A similar contention was made in the Wymore case, supra, and we there pointed out that a prosecuting attorney may not close his eyes to notorious law violations. It is true that the statutes of this State permit a private individual and by inference a police officer to file a formal sworn complaint charging the violation of the criminal laws. The filing of such a complaint, which may be the basis of an information in a misdemeanor case, is provided for in Sections 3415 and 3505, Revised Statutes Missouri 1929. In case of a felony such a complaint justifies the issuance by a magistrate of a state warrant and is the basis upon which a preliminary hearing can be held. [Section 3467, R. S. Mo. 1929.] But as we said in the Wymore case, "it is well known that private persons rarely file complaints." There exists a difference in this behalf in regard to different types of crime. Where a criminal act involves a direct and peculiar injury to some private individual, for example, an assault or a larceny, the individual may well be expected to sign and swear to the complaint. But where the crime is one against the body politic generally and not against a particular individual, as is the case with the laws in reference to gambling, intoxicating liquor, elections, etc., experience teaches that a private prosecuting witness will rarely come forward to initiate proceedings. It was the ancient practice in England for criminal proceedings, although brought in the name of the Crown, to be started by an individual prosecutor and carried on by counsel retained by him. But with the vast extension

of the field of criminal law made necessary by complex social and economic conditions of today, such a system is no longer practical. It is to meet this need and to safeguard the interests of the public generally that the office of the prosecuting attorney has been instituted. It is not only the right but the duty of the prosecutor in such cases to himself take the initiative. We so held in the Wymore case. Respondent says that he had no facilities for making investigations in these matters. It is in evidence that in prior years respondent had an investigator attached to his office force, and that while he had no such investigator during 1938 and the early part of 1939, he later obtained one. It is not shown that he made any effort to gain such an assistant during the period here involved. In any event he had the power to appear before grand juries and he had the power to apply for the issuance of search warrants. It may be that any effort on his part to correct the conditions mentioned would have been hedged around by difficulties. But this could not excuse a failure to make any attempt at investigation.

We conclude therefore that our commissioner properly found that respondent, by failing to perform the duties of his office, has forfeited the same under Section 11202, Revised Statutes Missouri 1929. He should therefore be ousted from the office of Prosecuting Attorney of Jackson County as of May 10, 1939, and until the end of his present term of office. For the usurpation of said office from said date to the date of the judgment herein a fine of one thousand dollars should be assessed against respondent, and the costs of this action should be taxed against him. It is so ordered. All concur.