**STATE of Missouri ex inf. John C. DAN-FORTH, Attorney General, Relator,**

v.

**Clyde ORTON, Respondent.**

**No. 55364.**

Supreme Court of Missouri,
En Banc.

March 8, 1971.

As Modified on Court's Own Motion
April 12, 1971.

Motion to Modify or Supplement Mandate
Denied April 12, 1971.

Motion to Stay Judgment and Order of
Ouster Denied April 13, 1971.

John C. Danforth, Atty. Gen., Jefferson City, Charles E. Rendlen, Jr., Special Asst. Atty. Gen., Hannibal, Dale L. Rollings, Asst. Atty. Gen., Jefferson City, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for relator.

James E. Reeves, Ward & Reeves, Caruthersville, for respondent.

HOLMAN, Judge.

Original proceeding in quo warranto commenced on January 16, 1970, upon the filing of an information by the Attorney General by which he seeks to oust respondent from the office of Sheriff of Pemiscot County. The information charged respondent with misconduct and neglect of duty in a number of respects hereinafter discussed. We appointed Hon. Ray Weightman as Special Commissioner to hear the evidence and report his findings of fact and conclusions of law. Judge Weightman held extensive hearings and has filed here a report in which he found that respondent had violated his duties in a number of respects and, by reason of such misconduct, had forfeited his office and should be ousted.

The first point raised by respondent is that "the court is without jurisdiction to hear this quo warranto proceedings because Art. VII, § 4, Constitution of Missouri [V.A.M.S.], and § 106.220 et seq., RSMo, vests exclusive jurisdiction in the circuit court to hear such actions." He recognizes, of course, that Art. V, § 4, Mo.Cons.1945, vests this court with jurisdiction to "issue and determine original remedial writs" and that quo warranto is such a writ. He contends, however, that the broad power thus bestowed is restricted as it relates to removal proceedings by the provisions of § 4, Art. VII, as follows: "Except as provided in this constitution, all officers not subject to impeachment shall be subject to removal from office in the manner and for the causes provided by law," and that, in accordance with said section, the legislature has enacted § 106.220 et seq.[1] which provide grounds and procedure for removal of county officers in a circuit court action, and he asserts that such procedure is exclusive.

The precise point now before us was ruled adversely to the respondent's contention in the case of State ex inf. McKittrick v. Wymore, 343 Mo. 98, 119 S.W.2d 941. In Wymore (a proceeding to remove a prosecuting attorney), under a somewhat similar constitutional provision, it was held that this court had jurisdiction to issue, hear, and determine writs of quo warranto

1. Statutory references are to RSMo 1969, V.A.M.S.

and that statutory enactments (the predecessors of § 106.220 et seq.), also providing a method for removing officers, were not exclusive and did not interfere with the jurisdiction of this court. The question was raised again and the holding of Wymore was reaffirmed in State ex inf. Taylor v. Cumpton, 362 Mo. 199, 240 S.W.2d 877. Another attack was made on our jurisdiction, upon the same grounds, in State ex inf. Dalton v. Mosley, 365 Mo. 711, 286 S. W.2d 721, a proceeding to remove a sheriff. In Mosley it was contended that the prior cases were not controlling because of the new (present) constitutional provision adopted in 1945. In ruling the contention adversely to respondent this court stated: "[W]e are unable to discern any real difference in meaning and effect between it [the predecessor constitutional section] and the corresponding section of the present Constitution, Art. VII, § 4, so that as regards the claim of exclusiveness of the statutory remedy, this case stands on the same footing as, and is controlled by the doctrine of, the Wymore case, in consequence of which the jurisdictional question raised by respondent is ruled against him." 286 S.W.2d 1. c. 723.

Recognizing that if we follow Wymore and Mosley he cannot prevail on this point, respondent contends that those cases were incorrectly decided and should be overruled. Our view is that the question before us was settled, under both constitutional provisions, by the Wymore and Mosley decisions and should no longer be considered to be an open question. We have, nevertheless, reviewed both cases and consider that they were soundly decided and that they are controlling here. The jurisdictional question is therefore decided adversely to respondent.

Our learned Special Commissioner has filed a 43-page report in which he discusses the evidence in detail and arrives at certain conclusions of fact and law. He found against respondent on some eleven charges, in favor of respondent on three charges, and considered it unnecessary to make findings on a number of others. We will confine our discussion to those charges which were found by the Commissioner to warrant forfeiture and ouster. The question arises as to the weight and effect to be given the findings and conclusions of the Commissioner. We have stated that " 'the findings of fact of a special commissioner are not binding, but are persuasive [State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, 169 S.W. 145], or, as said in State ex inf. v. Kansas City College of Medicine. & Surgery, 315 Mo. 101, 285 S. W. 980, 983, 46 A.L.R. 1472, "the conclusions of the commissioner are not binding on this court, but they are advisory and helpful." ' [In re Parkinson, 344 Mo. 715,] 128 S.W.2d [1023,] 1037. We conclude that it is our duty to make a full and complete review of the testimony and to reach our own conclusions as to the law and facts. We may, however, consider the persuasive effect of the commissioner's findings and, if we see fit, defer to his findings of fact based upon conflicting testimony." State on inf. Eagleton v. Stupp Bros. Bridge & Iron Co., Mo.Sup., 380 S.W.2d 382, 394. We have read this transcript (consisting of more than 1,500 pages) and have made our own findings which are substantially the same as those reported by the Commissioner.

■ Respondent was first elected to the office of sheriff for a four-year term beginning January 1, 1957. He has served continuously since that date, his latest term beginning January 1, 1969. A number of the items of alleged misconduct occurred during previous terms and respondent contends that such items may not be considered as grounds for ouster. This question has never been decided in this state. It arose in State on inf. McKittrick v. Graves, 346 Mo. 990, 144 S.W.2d 91, and in Mosley, supra, but in each case the court found a decision unnecessary and the question was reserved. Annotations in 17 A. L.R. 279, and 138 A.L.R. 753, indicate that the decisions in other states are about equally divided on the issue. We have de-

cided to again reserve the question since we are of the opinion that matters occurring during respondent's current term are sufficient to warrant a decision that respondent has forfeited his office. We hasten to add, however, that evidence of neglect of duty and misconduct during previous terms is admissible and may be considered (1) to the extent that such shows law violations which were still subject to prosecution during the current term, (2) because the showing of a state of facts during prior terms may be considered, the contrary not appearing, as have continued into the current term, and (3) as bearing on respondent's opportunity for knowledge of the conditions and indicating his attitude toward law enforcement. See Graves and Mosley, supra.

Respondent contends that at least a portion of the allegations are barred by statutes of limitation, citing §§ 516.130 and 541.210. While we are inclined to doubt that those statutes would apply to a quo warranto proceeding for removal of an official, our decision to limit causes for ouster to matters occurring during the current term makes it unnecessary to decide the question.

█ It is also respondent's contention that this proceeding is barred by laches. He cites State on inf. Eagleton v. Champ, Mo.Sup., 393 S.W.2d 516, a quo warranto proceeding attacking the validity of the incorporation of a village, which obviously has no application to a case such as the instant one. We hold that laches will not be permitted to bar a proceeding instituted by the State or its Attorney General to oust an official for neglect or misconduct. The nature of the proceeding and the inherent public interest preclude the application of that doctrine.

We will next consider the evidence relating to various charges. Pemiscot County is located in the extreme southeast corner of Missouri. Tennessee is just across the Mississippi River, and it is not far to the states of Mississippi and Alabama. It appears from the evidence that large quantities of whiskey had been transported from Caruthersville to dry counties (under local option) in those three states. For example, an officer from Florence, Alabama, testified they would seize about one load of whiskey a week (one load mentioned contained 33 cases) and that 90% of it came from the Delta Distributing Company of Caruthersville.

INCIDENT INVOLVING MISSISSIPPI OFFICERS: In September 1969 five Alcohol Control Agents from Mississippi were sent to Caruthersville to investigate the source of Missouri whiskey coming into their state. They started watching the rear of Eddie & Jay's Bar (of which Eddie Chilton was part owner), and the Climax Bar located next door. They saw whiskey from the Climax Bar being loaded into the trunk of a car. After the car was loaded the Missouri license plate was removed and a Mississippi tag was placed on the car. The officers followed the car but at a point in Tennessee the driver evidently discovered that she was being followed and stopped the car. She was arrested by a local sheriff and 29 cases of whiskey were confiscated. The next day the officers resumed their watch on the Bars in Caruthersville and, within a short time, a car arrived, occupied by respondent and Eddie Chilton. According to witness Harper, an agent from Mississippi, Chilton asked them "to get off his back"; that they refused to talk with Chilton but told respondent they would talk with him. Witness Harper continued: "The sheriff turned around and said, 'Damn it, Eddie, let me handle these people.' And at that time I gave the sheriff my identification. He had my driver's license. I pulled my identification out and showed it to the sheriff. I told him I was an enforcement agent from the State of Mississippi, Alcohol Beverage Control Division; told them what we were doing. He says, 'Why didn't you people contact me when you came in here?' * * * I said, 'Well, we had orders from the Jackson office not to

contact anybody, to come up here and observe. We are not violating your laws. We haven't done anything and we are just observing. We have made no arrests. We are not bothering anyone.' And he said, 'Well, I don't appreciate you so-and-so's or anybody else coming into my county and snooping around,' and he says to leave the county. And at that time I told him that our office sent us up here, that we would be here until our office told us to go home. He said, 'Well, if you don't leave you will be in my jail,' * * * and that 'if you get in my jail nobody will get you out.' * * * If you are here in the morning you will be in my jail." The agents returned to Mississippi shortly thereafter. Our Commissioner concluded that "the act of threatening Mississippi Agents Harper and Greer if they did not leave the county constituted willful and malicious oppression and misconduct. The act was an abuse of authority in his official capacity and under color of his office within the meaning of §§ 558.110 and 558.130 RSMo 1969."

Respondent testified that he investigated these officers because he had had a complaint that they were using binoculars and that had disturbed some of the people. He stated that he introduced himself "to the two people in the car and asked them for their driver's license which they showed me. They told me who they were, where they were from. I asked them why they hadn't asked me to help them. They, I believe, told me that they had instructions from Mississippi not to contact anybody up here, and I told them it had been the policy for anybody coming into the county at least to offer the courtesy of talking. I told them they were disturbing people there and if they didn't move from where they were they would stand a good chance of getting in jail here. If I had known they would have been armed, chances are they would have gotten in jail." We agree with the conclusions of the Commissioner as to this incident.

INCIDENT INVOLVING ALABAMA OFFICERS: Our conclusion regarding re-

spondent's conduct in regard to the Mississippi officers is bolstered by an incident occurring in 1967 which involved two Alabama officers. They came to Caruthersville to investigate the source of liquor being transported to Florence, Alabama. Upon arrival they parked and sat in the car for a time. Within a short time two cars approached, one parking in front of their car and the other behind it. The two drivers were respondent and the chief of police of Caruthersville. The Alabama men identified themselves and stated their business to the officers. In the presence of respondent the chief said that the identification didn't mean anything; that there was a motel about eight miles out of town and that they should go out there and get a room because "if we hung around there we would be put in jail." While this statement was made by the chief it is obvious that he and respondent were engaged in a joint investigation or mission of some kind and we think the respondent, by his acquiescence, is to be charged with responsibility therefor. It is true, as respondent points out, that the next morning these men came to respondent's office and gave him a list of known liquor violators and a description of their cars, with a request that if respondent saw any of those cars in Caruthersville to call the officers collect. They were treated courteously by respondent at that time. They returned to Alabama shortly thereafter but never heard from respondent concerning the list they had given him.

■  Respondent says we cannot consider the threat to the Alabama officers because it was not alleged in the information. We note that no objection was made to the testimony on the ground that it was beyond the scope of the pleadings and hence the information will be regarded as amended to conform to the proof. Harris v. Goggins, Mo.Sup., 374 S.W.2d 6 [6]. The same situation existed in regard to the Clete Stanfill incident hereinafter described.

FAILURE TO ENFORCE LIQUOR AND GAMBLING LAWS: A large part of the testimony before the Commissioner related to the subjects of open gambling and violation of the liquor laws in various places in Pemiscot County, and particularly in a large number of small cafes generally referred to in the evidence as "joints" or "honky-tonks," patronized largely by Negroes. We will refer as briefly as possible to the evidence in regard to those places. At the outset it should be stated that the Department of Liquor Control inaugurated an under-cover investigation of these places in October 1969 which continued until culminating in a number of raids conducted on January 10, 1970. Duane Franklin, Chief of Enforcement for the Department, testified that in November 1969 he and Agent Burch purchased beer and whiskey at Paul's Place, an unlicensed cafe in Caruthersville, and observed two dice tables there with gambling paraphernalia thereon; that they also observed betting on pool and bowling games at the Kozey Korner in Caruthersville. Trooper Bess, of the Highway Patrol, stated that he observed dice tables in the Flat Top Cafe and in Mac's Bar in Hayti; that he had also observed sales of liquor to minors at Davis Drive-In in Hayti; and that Hayti Heights (located outside the city limits of Hayti) has a reputation for many liquor law violations. Vernon Hopkins, a sergeant with the Highway Patrol, testified that he had been stationed in Hayti between 1955 and 1960 and that he had observed crap tables in most all of the "honky-tonks." Kenneth Howell, a highway patrolman, testified that he had seen dice shooting in progress on a dice table at Slater's Blue Room in Hayti in 1969. Robert Little of the Patrol testified that he had seen dice games in progress on two occasions at the Flat Top in Hayti. Benny Rapert of the Patrol was stationed in Hayti from 1961 to 1965. He testified that he had seen dice games in progess at Cripple Charlie's in Hayti, in Pepper's Inn, and in the Midway Cafe located about three miles northwest of Hayti; that he was always in uniform on these occasions but the participants did not stop shooting when he appeared.

Clifford Cummins, with the Highway Patrol, testified that he had been located in Pemiscot County for three years and had witnessed dice games in operation at the Flat Top and at Covington's Blue Room. Kenneth Ledbetter, now with the Highway Patrol, stated that prior to the last year he had been a telephone installer; that in 1967 and 1968 he had, on several occasions, gone into the back room at Tommie's Pool Hall in Hayti and observed a dice table and a poker game in progress; that he had seen business men playing cards there with bills piled in front of each player; that he had also repaired the telephone at the Flat Top on several occasions and had seen dice games in progress there several times. Fred McKay, city marshal at Hayti, testified that a delegation of citizens had contacted him about the taverns selling liquor on Sunday; they complained that they "couldn't get to their churches without having to walk over drunks"; that as a result of these complaints he prepared a letter, dated August 13, 1968, which was sent to six places located in Hayti and five places located outside the city limits; that these places were advised that complaints had been made and that they were requested to keep their places of business closed from 1:30 a. m. until 1 p. m. on Sundays. This letter was signed by Clyde Orton, Sheriff, as well as by the Chief of Police and the Mayor of Hayti. Paul Moore, a Patrolman who was in Pemiscot County from 1953 to 1958 testified that he rode with respondent on a number of occasions when he was a deputy sheriff and that they visited a number of these taverns and they saw gambling in all of them; that although they were in uniform the game would often continue after they went in and that sometimes respondent would pick up the dice and tell the participants that they should not be doing that and the game would then stop. Ed Hendricks, an officer with the Hayti Police Department,

testified that he had observed beer being sold on Sunday at the Flat Top and that he had seen three dice tables in the Flat Top, all of them in operation; that he had seen a crap table in operation at the Big Apple and also at the Little Apple; that gambling took place regularly in these places on weekends. He had also seen crap tables in operation at Ham's Place which was located just behind Mac's Bar. Apparently this witness made no arrests for these violations because he had not been instructed to do so.

Linda Luna worked as a meter maid in Hayti for about 2½ years prior to October 1969. Hayti had a system of granting monthly permits for parking. Miss Luna testified that she went into Ed James' Pool Hall two or three times a week in order to collect from men whose parking permits had expired; that she went to a room upstairs where men were gambling (obviously playing poker); that the men would have stacks of bills in front of them at least two inches high; that she would have on her police uniform but the men kept on playing. Joe Matthews of the Highway Patrol stated that he was assigned to Pemiscot County from 1958 to 1961; that he had seen dice games and gambling in a number of places in Hayti; that Pemiscot County had a bad reputation for violation of liquor and gambling laws; "it is a standing joke that if you want to gamble you can come to this county and do it." William R. Barker, an agent for the Liquor Control Department, testified that he observed dice games in operation at Paul's Place in Caruthersville even though a uniformed Caruthersville policeman was present at the time; that he also observed dice tables at Covington's, and that he observed purchases of liquor being made both at Paul's Place and at Covington's, even though neither had a license to sell liquor. William Suddarth, a farmer of Hayti, testified that he had played poker at James' Pool Hall and at Truckers Lounge. Al Reynolds, an agent with the Department of Liqour Control, testified that he was involved in the

raid on Covington's Blue Room on January 10, 1970, and that this place was engaged at the time in selling liquor without a license and that from twenty to twenty-five of its patrons were minors. Earl Burch, a Special Agent with the Liquor Control Department, testified that in the fall of 1969 he observed liquor sales and gambling in Paul's Place, Slater's Blue Room, and at the Big Apple, and liquor sale violations at the South End Cafe in Hayti, the City Tavern and O'Malley's Tavern in Steele, and at the Kozey Korner in Caruthersville. Charles Ross, a special investigator for the Attorney General's office, testified that he began an investigation in Pemiscot County in October 1969; that at the Club Zanza he observed the owner and another person play four games of pool at $20 a game; that he observed a poker game in progress at the Truckers Lounge; that he observed liquor violations at Covington's, Paul's Place, Big LeRoy's, and the Flat Top.

Quite a number of people testified that the reputation of Pemiscot County for violation of liquor and gambling laws was bad. On the other hand, respondent, in presenting his case, presented a larger number of witnesses who testified that the reputation of the county for law enforcement was good and that respondent's reputation as a law enforcement officer was good. Some agents for the Department of Liquor Control who had been located in Pemiscot County testified that respondent had always cooperated with them, as did the judge of that circuit, and a number of sheriffs and prosecuting attorneys from adjoining counties. Most of those officials, and also two ministers from Caruthersville, testified that respondent had a good reputation for law enforcement, and that the county's reputation in that regard was good. Lester Stone, Sheriff of Lake County, Tennessee, located just across the river from Pemiscot County, testified that respondent had a reputation for being a good law enforcement officer and that at one time respondent had notified him of a liquor shipment which was thought to be

entering Tennessee. On cross-examination he stated that Eddie Chilton had offered him a bribe of $450 a month to let liquor pass through Lake County, which he had declined.

COCK FIGHTING: There appears to be no question but that cock fighting was carried on near Hermandale in the southern part of Pemiscot County from 1963 until 1967. An arena was constructed in a barn with seats built around it which would seat about 200 people. There were about 180 chicken coops on the inside of the building upon which were written the weights, name of owner, etc., of roosters that were used in the fights. Spectators from several states attended these fights, and there was considerable evidence of betting at various odds on the fights. One of the spectators testified that steel spurs were fastened to the legs of the roosters and they would fight until one rooster was so disabled he couldn't fight any longer, or possibly killed. These fights were advertised locally by handbills. In May 1967 Leroy Sigmon wrote a column in the Caruthersville Democrat-Argus concerning the evils of this cock fighting operation, and stated that it was made even worse by the fact that young men from the Caruthersville area were attending the fights.

Another item concerning gambling related to the evidence that respondent personally made bets on horse races. Richard Pankey testified that he had been a deputy sheriff for respondent from 1961 to 1964; that on two occasions in the spring of 1964 respondent had called him from Hot Springs and instructed him to call a number in St. Louis and place certain bets on certain horses; that these bets were in large amounts; that the first time the bets totaled about $300, but on the second occasion he bet around $1,500; that he received a return call from St. Louis confirming the bets and that he then called the respondent in Hot Springs to advise him concerning the matter. Pankey was fired by respondent later that year. Some of respondent's witnesses testified

that Pankey had a bad reputation for truth, and relator presented other witnesses who testified that Pankey's reputation for truth and veracity was good. Respondent testified that he did not authorize Pankey to make any bets for him and had not made any bets on horse races except when he was personally present in Hot Springs where such betting is legal. However, Patrolman Keefer testified that he heard respondent telephone a bet on a horse race in 1963 and, on rebuttal, Charles Faris who had been respondent's chief deputy from January 1957 until August 1964 testified that he had heard respondent making calls from the sheriff's office on several occasions placing bets on horse races.

Respondent testified that unless he had complaints he depended largely upon the police departments to police the cities, the State Highway Patrol to patrol the major highways, and the Liquor Control Department to enforce the liquor laws; that he and his deputies were busy with their many and varied other duties, which were recited in detail in the evidence. He denied any conversation with the Alabama officers and denied knowing of the dice games and liquor violations in the various cafes and honky-tonks in the county. He also denied any knowledge of the cock fights in the county.

The Commissioner's findings and conclusions on this point include the following: "During the entire time of respondent's official capacity there were open and notorious violations of the gambling and liquor laws * * *. Respondent knew or should have known of such violations. Respondent's policy was to make no investigations without complaints with reference to such violations unless he saw them. * * * Respondent's position was, as established by his answers, that enforcement of these laws was upon other departments and agencies. In failing to investigate and take action against violators of the liquor laws and gambling laws of Missouri, respondent was guilty of willful violation and neglect of duty and of willful failure

and refusal to perform official acts which by law was his duty. His duties as sheriff do not permit him to select the criminal laws he will enforce or the person against whom he will proceed for violations. State v. Mosley, 365 Mo. 711, 286 S.W.2d 721. * * * Cock fighting with betting and gambling took place from 1963 to 1967 in Pemiscot County. It was open, notorious, and widely publicized. The respondent knew or should have known of these violations of law. Cock fighting, and betting on cock fighting, violate §§ 563.660 and 563.360. By his failure to act in this regard he willfully violated and neglected his duty * * *."

We agree with the findings and conclusions of the Commissioner. While we have not stated all of the evidence we think our abbreviated review thereof is sufficient to demonstrate that there were widespread violations of the liquor and gambling laws in Pemiscot County throughout the period respondent has been sheriff, and prior thereto. And, the violations were so open and numerous that we cannot reasonably reach any conclusion other than that respondent knew or should have known of them. There is evidence that he observed gambling operations in a number of these places when he was a deputy sheriff, and all indications are that such continued in the same manner until this proceeding was filed. It seems to us that respondent is bound to have known of the Sunday liquor violations in and around Hayti when he signed the letter requesting that eleven taverns there remain closed until after the Sunday morning church services were completed. And surely cock fights could not have been conducted in that county at an established arena, where crowds would gather after due advertisement, without respondent learning thereof. Patrolman Keefer said the cock fights were common knowledge. Furthermore, the fights were referred to in a newspaper published in the city where respondent lived. And, it is apparent that the people who participated in the various gambling games understood that they would not be disturbed by law officers since they seldom stopped their participation when a uniformed officer appeared—as Patrolman Rapert expressed it, "they didn't miss a lick." When Patrolman Howell was asked why he didn't report the dice games to the respondent and others he stated, "There was no reason for doing so. It is common knowledge."

Respondent stated that he relied on the police to enforce the laws in the cities. And it is apparent from the foregoing factual statement that the various city police officers made little, if any, effort to stop gambling or liquor violations. We answered a similar contention in State on inf. McKittrick v. Williams, 346 Mo. 1003, 144 S.W.2d 98, as follows: "His [sheriff] authority is county wide. He is not restricted by municipal limits. For better protection and for the enforcement of local ordinance the cities and towns have their police departments or their town marshals. Even the state has its highway patrol. Still the authority of the sheriff with his correlative duty remains. It has become the custom for the sheriff to leave local policing to local enforcement officers but this practice cannot alter his responsibility under the law. Usage cannot alter the law. * * * In every county there are a number of peace officers of varying authority. They and the sheriff must work in harmony. * * * Under these circumstances the sheriff may leave local enforcement in local hands, but only so long as reasonable efforts in good faith are made to enforce the law. * * * A sheriff may assume that a city police department will do its duty in enforcing the law and hence will not be guilty of any serious neglect of duty if he gives little attention to police matters in such city. But this rule has a proper qualification. If the sheriff has reason to believe that the police force is neglecting its duty it is his duty to inform himself. And if he knows that the police are ignoring or permitting offenses his duty to prevent and suppress such of-

fenses is the same as it would be if there were no municipality and no police force. The derelictions of other officials cannot excuse his failure to perform his statutory duties." 144 S.W.2d l.c. 104, 105. Under the facts in this case we think respondent was charged with the knowledge that no one was enforcing the laws against gambling and illegal liquor sales in Pemiscot County and it was therefore his official duty to make reasonable efforts to enforce such laws both within and without the cities. As indicated, we hold that he wilfully neglected his duties in that regard.

We agree with the finding of the Commissioner that respondent telephoned bets on horse races from his office. We also agree with respondent that such were not acts done under color of his office. We will not determine whether respondent violated any law in making those bets. However, betting is against the public policy of this State and, to say the least, respondent caused any bookmaker in this State with whom he dealt to violate the law. See § 563.350. This conduct on the part of respondent may properly be considered as an indication of his attitude toward the general subject of law enforcement.

CLETUS STANFILL INCIDENT: Cletus Stanfill was general manager of a radio station in Caruthersville. He witnessed a fight one evening (date not stated) at the Casanova. He later talked with the dispatcher at the sheriff's office who denied any knowledge of the occurrence "and was rude with me and hung the phone up." Thereafter Stanfill made a report on the radio which was critical of the sheriff's office. He testified that respondent then called him and said, "I will contact some of your advertisers and if that doesn't seem to do anything, you are not exactly married to your job. * * * And if that doesn't work we will try something else." These threats constitute another indication of respondent's tendency to be abusive and oppressive.

RETURN OF SLOT MACHINES: In 1962 a raid (in which respondent was not involved) was conducted on a place called The Oasis and certain gambling equipment, including two slot machines, was seized. The slot machines were left with respondent who kept them for about two years and turned them over to the Broadway Music Company. One of them was seen thereafter by a patrolman at Curtis Truck Stop in Hayti. Respondent said that the Broadway Music Co. claimed to be the owner of the machines and he turned them over to it after consulting with the prosecuting attorney. Section 563.375 provides the procedure for disposing of machines of that nature. It was not complied with. We agree with the conclusion of the Commissioner that the disposition made was unlawful and that respondent's failure to proceed under the statute constituted a willful neglect of duty and misconduct in office.

FAILURE TO FILE REPORT: Under § 51.150(5) it was respondent's duty to file a report on or before February 15, 1970, listing all salaries and nonaccountable fees received during the preceding calendar year. He did not file the report until about March 15, 1970, after the matter had been publicized in the newspapers. His excuse for not filing on time was that the form had not been furnished him and also that the task had been delegated to an employee. The failure to file the report on time was a neglect of duty. It would not likely be, of itself, a sufficient reason for ouster, but it is a proper matter to be considered along with evidence of other items of neglect.

SALE OF LIQUOR FOR TRANSPORTATION INTO NEARBY STATES: It is reasonable to conclude from his threats to the Mississippi and Alabama officers that respondent did not want anything to occur in Pemiscot County which would discourage persons from dry counties in nearby states from buying liquor in Caruthersville. Except for one instance with Sheriff Stone, he admittedly

failed to cooperate with officers from other states in that regard because he "never tried to enforce Alabama and Mississippi laws." He also stated that he had been advised that it was not illegal under Missouri law to haul liquor out of Caruthersville which was destined for dry counties in other states. It seems obvious that respondent knew these shipments were being made. It is our view that the transportation of more than five gallons of intoxicating liquor is an offense in this State unless certain strict requirements concerning permits, bills of lading, route to be traveled, etc. are complied with. See §§ 311.420 and 311.450. It would appear that the shipments we are considering all involved much more than five gallons and, under the circumstances, it is doubtful that the foregoing statutes were complied with. It is our view that respondent had a duty to make a reasonable effort to ascertain if these laws were being violated and, if so, to make arrests; and that his failure to do so was a willful and intentional disregard and neglect of his duty.

■ SUMMARY: As heretofore stated we base our judgment in this case upon matters occurring during respondent's current term. Those may be specified as (1) the threats to the Mississippi officers, (2) failure to enforce gambling laws, (3) failure to enforce liquor laws, and (4) failure to timely file the report required by § 51.-150(5). We have considered evidence relating to matters occurring in prior terms insofar as they relate to the issues to be actually decided.

We hold that respondent is guilty of willful oppression and abuse of authority as specified in § 558.110, and is also guilty of willful misconduct and neglect of duty and accordingly has forfeited his office under the provisions of § 106.220. He is now guilty of usurping such office and his ouster must go as a matter of course. We are supported in our decision by State ex inf. McKittrick v. Wymore, 345 Mo. 169, 132 S.W.2d 979, State on inf. McKittrick

v. Graves, 346 Mo. 990, 144 S.W.2d 91, State on inf. McKittrick v. Williams, 346 Mo. 1003, 144 S.W.2d 98, and State ex inf. Dalton v. Mosley, 365 Mo. 711, 286 S.W.2d 721. Our Commissioner, who heard the evidence, did not recommend the imposition of a fine and therefore we will not assess one.

It is ordered that respondent is ousted from the office of Sheriff of Pemiscot County until the end of his present term expiring December 31, 1972, and the costs of this proceeding are taxed against him.

FINCH, Acting C. J., DONNELLY, SEILER, and MORGAN, JJ., and WOLFE, Special Judge, concur.

BARDGETT, J., dissents in separate dissenting opinion filed.

HENLEY, C. J., not sitting when cause was submitted.

BARDGETT, Judge (dissenting).

I respectfully dissent. In my opinion, this court cannot entertain jurisdiction of an original action to oust a county official from office under the Constitution of Missouri 1945, Art. VII, § 4, in view of the legislative action in enacting into law § 106.220 et seq., which provisions specifically provide for the procedure to be followed in such cases.

At the outset it must be noted that respondent filed his motion to quash this court's original writ and summons on February 13, 1970, and set forth his reasons therefor, thus there was no delay in asserting his position.

Art. VII, § 4, Constitution 1945, provides: "Except as provided in this constitution, all officers not subject to impeachment shall be subject to removal from office in the manner and for the causes provided by law."

The only officers subject to impeachment under the 1945 Constitution are those

set forth in Art. VII, § 1, all of which are elective officials of this state (not county) and the other constitutional officers which are judges of the supreme court, courts of appeals and circuit courts. Art. VII, § 6, provides for the automatic forfeiture of office if a public officer employs certain relatives. This provision is self-executing and quo warranto under § 531.010 et seq. is available as the method of proceeding to oust the official since he has done an act which, under the constitution, automatically causes a forfeiture and, therefore, he is an usurper or intruder. State ex inf. Norman v. Ellis, 325 Mo. 154, 28 S.W.2d 363. Respondent does not fall within these categories.

The opening words of Art. VII, § 4, "Except as provided in this constitution" indicate that the removal from office of some officials, not subject to impeachment, has been specifically provided for in other sections of the constitution which, if correct, would explain the reasons for this opening phrase. There are such specific provisions. Art. III, § 18, provides that "Each house * * * shall be sole judge of the qualifications, * * * of its own members * * *" This section was held in State ex inf. Danforth v. Banks, Mo., 454 S.W.2d 498, to be exclusive insofar as qualification of the members of the legislature was concerned and not merely as alternative or parallel proceedings to quo warranto when the ouster of a member of the legislature was the subject of the action.

Art. IV, § 17, invests the governor with power to remove all appointive officers without the procedure of impeachment. Thus the constitutional language of Art. VII, § 4, recognized that the constitution itself provided for removal by methods other than impeachment and avoided conflict within itself by the use of the language noted above.

The remaining words of Art. VII, § 4, are "all officers * * * shall be subject to removal from office in the manner and for the causes provided by law." In my opinion this provision of Art. VII, § 4, delegated to the general assembly the authority to provide for the grounds for removal and method of removal from office of all officers other than those subject to removal by impeachment under Art. VII, § 1, or subject to removal by another specific constitutional provision of which Art. III, § 18, relating to members of the general assembly, Art. IV, § 17, relating to appointive officers, and Art. VII, § 6, relating to nepotism, are examples.

I would not hesitate to agree that, in the absence of legislative action implementing Art. VII, § 4, this court retained its power to oust such officials under traditional quo warranto procedures, for the people, in adopting the constitution, could not have intended a vacuum to exist with respect to the ouster of unfaithful public officials.

Therefore, if § 106.220 ended *without* the language, "and may be removed therefrom in the manner provided in sections 106.230 to 106.290", I would agree that the procedure for removal for the causes specified in § 106.220 is quo warranto.

Section 106.220 is the statutory provision under which this action was brought. Relator's information alleges that "Respondent, pursuant to Section 106.220, RSMo 1959, has forfeited his said office as Sheriff, and has unlawfully usurped and held such office since January 1, 1957."

Relator having sought the removal of respondent pursuant to § 106.220 should be required to proceed in the manner provided for in § 106.220 which is the procedure set forth in §§ 106.230 to 106.290.

I hold this view because the 1945 Constitution, Art. VII, entitled "Public Officers", § 4, specifically provides that "* * * all officers not subject to impeachment shall be subject to removal from office in the *manner* and for the *causes* provided by law." (Emphasis mine.) Section 106.220 assumes that the official has lawfully come into office and is not a usurper or intruder

or unlawfully holding or executing an office, but that, having come into office lawfully, his *conduct thereafter* was in violation of the duties of his office. Thus Chapter 106 relates exclusively to public officers who have been lawfully elected or appointed and thereafter knowingly, willfully or fraudulently violate their duties.

As stated, in the instant matter relator filed the information seeking removal under § 106.220 which permits removal only, and failed to proceed to remove respondent in the manner provided in §§ 106.230 to 106.290. These procedures provide for the prosecuting attorney to file a complaint in circuit court setting forth in plain and concise language the charge against the official—§ 106.230. The governor may direct the attorney general to assist in the prosecution, and if the prosecuting attorney refuses to file a complaint the attorney general is given authority to file it—§ 106.250. If the action is against a sheriff, the circuit judge shall make an order disqualifying the sheriff and appoint an elisor for the summoning of the jury and performing the duties of sheriff in the trial of the cause—§ 106.260. This action is in the nature of a civil proceeding—§ 106.270. Section 106.280 provides that "in all prosecutions under sections 106.220 to 106.290, the defendant shall, upon conviction, after judgment of removal is entered, be entitled to an appeal to the supreme court of Missouri, * * *"

Relator, avoiding the statutory procedures set forth above, utilized either common-law quo warranto procedures or statutory quo warranto procedures under Chapter 531 (Quo Warranto), and thus avoided the respondent's right to jury trial in circuit court and deprived respondent of an appeal to this court should he be found guilty. Additionally, although not assessed, respondent became subject to being fined as provided for in § 531.050 against usurpers, intruders, and those holding office unlawfully.

Finally, the criminal statute—558.110, under which respondent was not charged—is brought into play and respondent is found guilty of willful oppression and abuse of authority as specified in § 558.110.

It is this judicial mixture of causes for removal (106.220) with procedures under a different statute (531.010 et seq.) and conclusions of guilty under a criminal statute (558.110) and concluding with forfeiture and ouster under the first statute (106.220) that I believe is unacceptable and does not, in my opinion, comport with a reasonable interpretation of Art. VII, § 4 of the 1945 Constitution and the various legislative enactments referred to supra.

I realize that this view is contrary to prior decisions of this court, particularly State ex inf. Dalton v. Mosley, 365 Mo. 711, 286 S.W.2d 721, decided in 1956, wherein this court followed the decision of State ex inf. McKittrick v. Wymore, 343 Mo. 98, 119 S.W.2d 941, 944, decided prior to the 1945 Constitution. In Wymore the court held that the 1924 amendment to Art. 14, Sec. 7, Constitution 1875, did not make the provisions of §§ 11202–11209, RSMo 1929, now §§ 106.220 to 106.290, RSMo 1969, V.A.M.S., the exclusive remedy.

The principal opinion in Wymore held that Art. 14, Sec. 7, Constit. 1875, as amended 1924, provided: "The General Assembly shall, in addition to other penalties, provide for the removal from office of county, city, town and township officers, on conviction of willful, corrupt or fraudulent violation or neglect of official duty. Laws may be enacted to provide for the removal from office, for cause, of all public officers, not otherwise provided for in this Constitution."

The concurring-in-result opinion of Leedy, J., concurred in by two judges, held that the 1924 amendment repealed the first sentence stated above and substituted therefor the second sentence so that Art.

14, § 7, read: "Laws may be enacted to provide for the removal from office, for cause, of all public officers, not otherwise provided for in this Constitution." Judge Leedy then held that Art. 14, § 7, of the 1875 Constitution as amended in 1924 was merely permissive and not a constitutional mandate to the general assembly imperatively requiring action by the general assembly and, consequently, saw no conflict between a proceeding in quo warranto as opposed to the provisions of what is now § 106.220 et seq.

The 1945 Constitution, Art. VII, § 4, was in effect at the time State ex inf. v. Mosley, supra, was decided, and Judge Leedy writing for the court held that, since the majority of the court in Wymore saw no limitation in the provisions of the 1924 amendment restricting this court's jurisdiction in quo warranto, he was unable to discern any real difference in meaning or effect between it and the corresponding section of the present constitution, Art. VII, § 4, and, therefore, the doctrine of the Wymore case would be followed.

Whether the constitutional provisions in Wymore were as the principal or concurring opinion held them to be, the Constitution of 1945 nevertheless abandoned that language entirely by completely eliminating the previous constitutional causes for removal found in Art. 14, § 7, to wit: " * * * willful, corrupt or fraudulent violation or neglect of duty," as well as the other language previously employed, and provided that " * * * all officers not subject to impeachment *shall* be subject to removal from office in the *manner* and for the causes provided by law." (Emphasis mine.)

It is because of this constitutional provision, not the act of the legislature in and of itself, that I believe makes the legislative act, § 106.220 et seq., exclusive as to the procedure to be followed when removal is sought for conduct within the scope of the causes for removal set forth therein, and for this reason I believe Mosley was incorrectly decided on jurisdiction and should be overruled.

In Wymore the principal opinion held that § 11202 (now § 106.220) did not confer any new right and, therefore, was not exclusive but merely cumulative, although recognizing that there is law to the effect that if a new right is created it may be the exclusive remedy. State ex inf. McKittrick v. Wymore, supra, 119 S.W.2d loc.cit. 945. Although § 11202 (106.220) may not, by itself, have created a new right, it did by its own terms provide for a new procedure as set forth in §§ 11203–11209 (now §§ 106.230–106.290), and the new procedure included a new right—that of a jury trial and, if found guilty, an appeal to this court, §§ 106.260 and 106.280.

In Parker v. Sherman, Mo., 456 S.W.2d 577, Division Two of this court held that a defending sheriff has a right to a jury trial when removal is sought under §§ 106.-230 to 106.290, although also saying that this was not the exclusive remedy. It would seem obvious that §§ 106.230 to 106.-290 have absolutely no meaning in the absence of § 106.220 since it is by the force of § 106.220 that the subsequent sections become operative.

If relator styles his action an information in the nature of quo warranto, then a commissioner is appointed to take testimony, and, consequently, no jury trial is had and no appeal to this court is afforded. If he styles it a complaint for removal under § 106.230 and files it in circuit court, the respondent is afforded a jury trial and an appeal here. I believe the right to have a jury pass on the credibility of witnesses is a substantial right that cannot be lightly disregarded.

In the instant case, the transcript is replete with contradictory testimony, and the outcome of the case is dependent upon an

assessment by the finder of facts as to the credibility of the witnesses. This assessment can best be made by seeing, observing and hearing the witnesses. Where a jury trial is provided for, this function becomes the jury's primary task, and the right to have this task performed by a jury is very important to the litigants.

If § 106.220 et seq. confer the right to a jury trial, which I believe they do, then it does not comport with due process to permit this right to be nullified at the whim of the relator in selecting the name of the action or what court he chooses to file it in.

This court in State ex inf. Anderson v. Consolidated School Dist. No. 4 of Iron County, Mo., 417 S.W.2d 657, 659, rejected an attempt to utilize quo warranto as a substitute for an election contest and held: "The rule is well established in Missouri that the character of a cause of action is determined from the facts stated in the petition and not by the prayer or name given the action by the pleader."

In the instant case, no matter how the action is styled nor whether the prayer asks that forfeiture be declared or the respondent be removed, the cause of action seeks one objective—removal of a public official—and is based on acts within the statutory causes set forth in § 106.220. The action, therefore, should, in my opinion, be governed from beginning to end under §§ 106.220–106.290, RSMo 1969, V. A.M.S.

I will not unduly lengthen this dissent by reviewing all of the cases following Wymore and Mosley, as they rely on Wymore and Mosley. Thus if Wymore and Mosley were incorrectly decided and are overruled, then those cases relying thereon also would be overruled.

I would quash our writ of quo warranto without prejudice to proceed under §§ 106.-220 to 106.290, RSMo 1969, V.A.M.S.