[No. 17256-9-II. Division Two. November 6, 1995.]
THE STATE OF WASHINGTON, *Respondent*, v. SHAWN DAVID KNIGHT, ET AL., *Appellants*.

---

R.A. *Lewis* of *Knapp, O'Dell & Lewis*, for appellants.

*Bradley Andersen, Prosecuting Attorney*, and *Michael B. Dodds, Deputy*, for respondent.

MORGAN, J. — Shawn David Knight and Damon T. Messersmith appeal their felony drug convictions. We affirm except for one count.

At all times material to this case, Deputy Arne Gonser was employed by the Skamania County Sheriff's Office. Officer Craig Landwehr, Officer Douglas Luse, and Captain Robert Kanekoa were employed by the Vancouver Police Department. Lieutenant James Pillsbury was employed by the Clark County Sheriff's Office. Raymond Blaisdell was the Sheriff of Skamania County and, by contract, the chief law enforcement officer for the City (now Town) of Stevenson. Stevenson is an incorporated municipality within Skamania County.

Gonser, Landwehr, Luse, and Pillsbury were also members of an interlocal Drug Enforcement Task Force called the Clark-Skamania Narcotics Task Force. Kanekoa was not. Pillsbury was the task force supervisor.

The task force had been formed in 1988, by written agreement executed pursuant to RCW 39.34. The agreement provided "for the establishment of a Drug Enforcement Task Force to be supported by the financial and manpower resources of the participating jurisdictions in accordance with the provisions set forth hereinbelow." The agreement was signed by Clark County, Skamania County, and the Cities of Vancouver, Camas, and Washougal. It was also signed by the Sheriff of Clark County and the Sheriff of Skamania County. It was not signed by the City of Stevenson.

On May 13, 1992, Luse bought from Shawn Knight a substance that appeared to be methamphetamine. Luse made the buy at Knight's residence in Stevenson. The substance turned out to be vitamin B.

On May 27, 1992, Luse tried to make another buy from Knight. Knight indicated he had no drugs to sell.

On June 18, 1992, in anticipation of again contacting Knight, Luse applied to Pillsbury for authority to intercept and record conversations. See RCW 9.73.230(1). Pillsbury granted the requested authorization and filled out a written report. See RCW 9.73.230(2). Wearing a body wire, Luse went to Knight's residence in Stevenson, where he purchased methamphetamine from Knight and Messersmith while Landwehr and Gonser recorded the conversation on standard cassette tapes. On June 25, 1992, Pillsbury signed a report to the court. See RCW 9.73.230(6).

On June 26, 1992, in anticipation of contacting Knight again, Luse applied to Kanekoa for another grant of authority to intercept and record. Kanekoa granted the requested authorization and filled out a written report listing "all members of the Clark-Skamania Narcotics Task Force"[1] as persons empowered to intercept and record. See RCW 9.73.230(2). Wearing a body wire, Luse again went to Knight's residence, where he bought methamphet-

---

[1] Ex. 9.

amine from Knight while Landwehr and Gonser recorded the transaction on standard cassette tapes. Messersmith was not present on this occasion. On July 1, 1992, Kanekoa signed a report to the court. *See* RCW 9.73.230(6).

On July 16, 1992, a judge of the Skamania County Superior Court reviewed both intercept reports and found probable cause.

On November 4, 1992, by amended information, the State charged Knight with one count of delivery of material in lieu of a controlled substance on May 13 (Count I), delivery of a controlled substance on June 18 (Count II), and delivery of a controlled substance on June 26 (Count III). On November 19, 1992, the State charged Messersmith with delivery of a controlled substance on June 18. In all but Count I against Knight, the State alleged that the crime was committed "within 1,000 feet of the perimeter of the school grounds."[2]

Knight and Messersmith moved to suppress evidence obtained as a result of the recorded conversations. A hearing was held, and the motion was denied. The cases proceeded to trial, at which the recordings made on June 18 and June 26 were admitted. The jury returned guilty verdicts on all counts.

Knight and Messersmith now appeal. None of their arguments is directed at the May 13 count against Knight. Thus, the conviction on that count will be affirmed.

With respect to the remaining three counts, Knight and Messersmith contend that the police unlawfully recorded the transactions that took place in Stevenson on June 18 and June 26. We agree as to the June 26 transaction (Knight's Count III), but disagree as to the June 18 transaction (Knight's Count II and Messersmith's Count I). The

[2]Messersmith's clerk's papers at 1; Knight's clerk's papers at 25-26.

primary governing statute is RCW 9.73.230, pertinent portions of which are set forth in the margin.[3]

## I

Knight and Messersmith make three constitutional arguments. We consider each separately.

## A

■ Knight and Messersmith argue that Laws of 1989, chapter 271, codified in part as RCW 9.73.230, violates the "single subject" clause of the Washington Constitution.

---

[3]RCW 9.73.230 provides in part:

(1) As part of a bona fide criminal investigation, the chief law enforcement officer of a law enforcement agency or his or her designee above the rank of first line supervisor may authorize the interception, transmission, or recording of a conversation or communication by officers under the following circumstances:

(a) At least one party to the conversation or communication has consented to the interception, transmission, or recording;

(b) Probable cause exists to believe that the conversation or communication involves the unlawful manufacture, delivery, sale, or possession with intent to manufacture, deliver, or sell, controlled substances as defined in chapter 69.50 RCW, or legend drugs as defined in chapter 69.41 RCW, or imitation controlled substances as defined in chapter 69.52 RCW; and

(c) A written report has been completed as required by subsection (2) of this section.

(2) The agency's chief officer or designee authorizing an interception, transmission, or recording under subsection (1) of this section, shall prepare and sign a written report at the time of authorization indicating:

(a) The circumstances that meet the requirements of subsection (1) of this section;

(b) The names of the authorizing and consenting parties, except that in those cases where the consenting party is a confidential informant, the name of the confidential informant need not be divulged;

(c) The names of the officers authorized to intercept, transmit, and record the conversation or communication;

(d) The identity of the particular person or persons, if known, who may have committed or may commit the offense;

(e) The details of the particular offense or offenses that may have been or may be committed and the expected date, location, and approximate time of the conversation or communication; and

(f) Whether there was an attempt to obtain authorization pursuant to RCW 9.73.090(2) and, if there was such an attempt, the outcome of the attempt.

For the reasons set forth in *State v. Jenkins*, 68 Wn. App. 897, 847 P.2d 488, *review denied*, 121 Wn.2d 1032 (1993), and *State v. Acevedo*, 78 Wn. App. 886, 899 P.2d 31 (1995), we hold to the contrary.

B

 Knight and Messersmith argue that RCW 9.73.230 violates separation of powers and due process of law, because it allows law enforcement officers, rather than a neutral magistrate, to determine probable cause. However, as the supreme court has said in a different context, this argument "appears to put the cart before the horse." *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 298, 840 P.2d 860 (1992). Under the federal constitution, there is no search when one party consents to the interception and recording of a private conversation. *United States v.*

---

(3) An authorization under this section is valid in all jurisdictions within Washington state and for the interception of communications from additional persons if the persons are brought into the conversation or transaction by the nonconsenting party or if the nonconsenting party or such additional persons cause or invite the consenting party to enter another jurisdiction.

(4) The recording of any conversation or communication under this section shall be done in such a manner that protects the recording from editing or other alterations.

(5) . . . The authorizing officer shall sign the written report required under subsection (2) of this section, certifying the exact date and time of his or her signature. . . .

(6) Within fifteen days after the signing of an authorization that results in any interception, transmission, or recording of a conversation or communication pursuant to this section, the law enforcement agency which made the interception, transmission, or recording shall submit a report including the original authorization under subsection (2) of this section to a judge of a court having jurisdiction which report shall identify (a) the persons, including the consenting party, who participated in the conversation, and (b) the date, location, and approximate time of the conversation.

. . . .

(7)(a) Within two judicial days of receipt of a report under subsection (6) of this section, the court shall make an ex parte review of the authorization, but not of the evidence, and shall make a determination whether the requirements of subsection (1) of this section were met. If the court determines that any of the requirements of subsection (1) of this section were not met, the court shall order that any recording and any copies or transcriptions of the conversation or communication be destroyed. . ..

*White*, 401 U.S. 745, 91 S. Ct. 1122, 28 L. Ed. 2d 453, *cert. denied*, 406 U.S. 962 (1971). The same is true under Article I, Section 7 of the Washington Constitution. *State v. Salinas*, 119 Wn.2d 192, 197, 829 P.2d 1068 (1992); *State v. Pulido*, 68 Wn. App. 59, 63, 841 P.2d 1251 (1992), *review denied*, 121 Wn.2d 1018 (1993). Here, Luse was a party to the intercepted conversations, and he consented to the conversations being recorded. Thus, there was no search for purposes of either the federal or state constitution; no constitutional requirement that a magistrate or anyone else determine probable cause; and no constitutional violation merely because, on two occasions, police supervisors took action using a statute that imposes standards more stringent than those imposed by the federal or state constitution.

## C

█ Knight and Messersmith argue that RCW 9.73.030, RCW 9.73.090, and RCW 9.73.230 violate the equal protection clause "even under the most minimal scrutiny."[4] This is true, they say, because RCW 9.73.030 and RCW 9.73.090 give more protection to the privacy rights of nondrug suspects, including those who have committed crimes of violence, than RCW 9.73.230 gives to the privacy rights of drug suspects. They assert there is no rational basis for this difference, and that they should receive the privacy rights afforded by RCW 9.73.030 and RCW 9.73.090.

According to the Legislature, drug crime is prevalent. RCW 9.73.200. More than other crimes, it is routinely investigated by undercover operatives who face numerous life-threatening situations. RCW 9.73.200. The resultant need to assure the safety of a large number of undercover operatives provides a rational basis for distinguishing be-

---

[4]Br. of Appellant at 32. Knight and Messersmith also cite RCW 9.73.220, but it adds nothing to the analysis.

tween drug and nondrug crimes, and for the classifications used by RCW 9.73.030, RCW 9.73.090 and RCW 9.73.230.

## II

Knight and Messersmith make a number of arguments designed to show that the police failed to comply with RCW 9.73.230. We consider most of them separately.

## A

Knight and Messersmith argue (1) that Pillsbury and Kanekoa could not authorize the interception or recording of conversations outside their respective jurisdictions, and (2) that Pillsbury's and Kanekoa's respective jurisdictions did not include Stevenson. As a result, they say, the authorizations to record conversations at Knight's residence in Stevenson were invalid; the recordings were improperly admitted at trial; and the convictions based on the June 18 and June 26 transactions should be reversed.

■ ■ To support the proposition that Pillsbury and Kanekoa could not authorize the interception of conversations outside their respective jurisdictions, Knight and Messersmith rely on RCW 9.73.230(3). It provides:

> An authorization under this section is valid in all jurisdictions within Washington state and for the interception of communications from additional persons if the persons are brought into the conversation or transaction by the nonconsenting party or if the nonconsenting party or such additional persons cause or invite the consenting party to enter another jurisdiction.

As they argue, this statute means, by necessary implication, that an authorization to intercept and record is invalid outside the jurisdiction of the issuing supervisor except when "the nonconsenting party or such additional persons cause or invite the consenting party to enter another jurisdiction." RCW 9.73.230(3). The stated exception does not apply here, and other exceptions may not be implied. *Jepson v. Department of Labor & Indus.*, 89 Wn.2d

394, 404, 573 P.2d 10 (1977) ("[w]here a statute provides for a stated exception, no other exceptions will be assumed by implication."); *see also In re Eaton*, 110 Wn.2d 892, 898, 757 P.2d 961 (1988); *State v. Roadhs*, 71 Wn.2d 705, 707, 430 P.2d 586 (1967). Under the circumstances present here, neither Pillsbury nor Kanekoa could authorize the interception or recording of conversations outside his jurisdiction.

Knight and Messersmith argue that Kanekoa's jurisdiction did not include Stevenson because he was a Vancouver city police officer, and not a member of the task force. We agree. Kanekoa's jurisdiction was the City of Vancouver. It did not include the City of Stevenson. The authorization he issued on June 26 was invalid, and Knight's conviction on Count III must be reversed.

Knight and Messersmith argue that Pillsbury's jurisdiction did not include Stevenson, even though Pillsbury, in addition to being a Clark County Sheriff's deputy, was the supervisor of the Clark-Skamania Task Force. We disagree.

■ Pillsbury, when acting as supervisor of the task force, had jurisdiction coextensive with the task force's jurisdiction. Thus, we analyze his jurisdiction by analyzing the task force's jurisdiction.

■■ The task force had jurisdiction in Stevenson, not because the City of Stevenson had joined in the task force agreement—it had not—but because the Sheriff of Skamania County had joined in the task force agreement. According to the common law and the law of other states, a sheriff has authority to enforce state criminal law in any part of the county, incorporated or not. Thus, one court has said "[T]he jurisdiction of the sheriff in law enforcement matters normally extends throughout his county including the incorporated areas thereof." *People v. Scott*, 259 Cal. App. 2d 268, 66 Cal. Rptr. 257, 265 (1968). Another court has said: "[The sheriff's] authority is county wide. He is not restricted by municipal limits." *State ex rel. McKittrick v. Williams*, 346 Mo. 1003, 1014, 144

S.W.2d 98, 104 (1940); *see also State ex rel. Danforth v. Or-ton*, 465 S.W.2d 618, 626, *cert. denied*, 404 U.S. 852 (Mo. 1971). A third court has said,

> [I]t is clear that the duties and powers of a sheriff within the limits of an incorporated city are precisely the same that they are in the remainder of the county. The law draws no distinction.

*State ex rel. Thompson v. Reichman*, 135 Tenn. 653, 666, 188 S.W. 225, 228 (1916); *see also Commonwealth ex rel. Davis v. Malbon*, 195 Va. 368, 78 S.E.2d 683, 685 (1953); *In re Sulzmann*, 183 N.E. 531, 532 (Ohio 1932).[5]

Although Washington lacks a case on point, *cf. State ex rel. Johnston v. Melton*, 192 Wash. 379, 73 P.2d 1334 (1937), we think Washington law is in accord. As the Washington Attorney General has observed: "Nowhere has the [Washington] Legislature indicated that the sheriff's powers and duties are limited to the unincorpo-rated areas of the county." 4 Op. Att'y Gen. 2; *see also* RCW 36.28.010-.011; 25 Op. Att'y Gen. 61-62, at 4-5 (April 28, 1961). Thus, a sheriff in Washington has jurisdiction to enforce state criminal law anywhere within the bounda-ries of his or her county. *See* RCW 36.28.010-.011.

Here, the Sheriff of Skamania County was a party to the interlocal task force agreement. Nothing in the agree-ment indicates that he intended to vest the task force with jurisdiction over less than all of his county. On the contrary, it is apparent that when he joined the agree-ment, he intended to vest the task force with jurisdiction

---

[5]The encyclopedias are also in accord. At 80 C.J.S., *Sheriffs and Constables* § 36a, at 205 (1953), the author states:

> Since the sheriff is a county officer, his authority extends over the entire county, and includes all municipalities and townships within his county.

And at 70 AM. JUR. 2D, *Sheriffs, Police, and Constables* § 3, at 226 (1987), the author states:

> Thus, it has been said that a sheriff's jurisdiction in enforcement matters extends throughout his county; the sheriff has concurrent jurisdiction with that of the city police within the boundaries of any city within his county.

as broad as that which he possessed. Because he had juris-diction to enforce state criminal law in Stevenson, so did the task force and so did Pillsbury.

The parties debate the effect of two 1991 notices of consent issued by the Skamania County Sheriff pursuant to RCW 10.93.070(1).[6] One documented "consent to the full exercise of peace officer powers within the unincorporated boundaries of Skamania County, Washington, by any and all properly certificated or exempt officers of Clark County Sheriff's Office." The other gave equivalent consent to the Vancouver Police Department. Each was a consent to outside officers entering Skamania County pursuant to RCW 10.93.070(1). Neither was a restriction that purported to exclude from Skamania County outside officers already operating in the county by virtue of an agreement formed pursuant to RCW 39.34.[7] Neither altered the effects of the interlocal task force agreement, and neither is material here.

## B

■ Knight and Messersmith argue that even if Pills-bury had jurisdiction to authorize the recording of conversations in Stevenson, he was not "empowered to au-thorize one party consent recordings for detectives who were not under the immediate supervision and control of" his own agency, the Clark County Sheriff's Department.[8] This is true, they say, because "the interlocal agreement which created the Task Force expressly provided that each agency supervised only its own employees."[9]

---

[6]RCW 10.93.070(1) provides in part that a Washington peace officer may enforce the criminal laws of the state anywhere within the state's boundaries, upon a written notice of consent issued by the sheriff in whose territorial juris-diction the enforcement occurs.

[7]Indeed, during motion proceedings the Sheriff testified that he had intended the notices to apply "in" and "throughout" Skamania County, and that the language limiting his consent to unincorporated areas was a "mistake."

[8]Br. of Appellants at 36-37.

[9]Br. of Appellants at 37.

Apparently, Knight and Messersmith are referring to paragraph 4 of the agreement. It states:

> Section 4. Liability. Personnel assigned to the task force shall be deemed to be continuing under the employment of the assigning jurisdiction. As among the participating agencies, liability shall be governed by the mutual aid agreement separately entered into by and among them.[10]

This paragraph allocates liability. It does not describe who will supervise members of the task force, nor does it restrict the jurisdiction of any member of the task force.

Having set aside paragraph 4, we find nothing else in the agreement that expressly, or even impliedly, provides that each agency will supervise only its own employees. On the contrary, the agreement expressly creates a *multi-jurisdictional* executive board with responsibility for "review and oversight of task force operations."[11] It also contemplates a *multi-jurisdictional* command structure, as clearly shown by the Board later designating Lieutenant Pillsbury of the Clark County Sheriff's Office as top-level supervisor and Sergeants Dan St. Pierre of the Washington State Patrol and Danne Johnson of the Vancouver Police Department as first-line supervisors. We conclude that Pillsbury had supervisory authority over all task force members; that he was above the rank of first line supervisor; and, as a result, that he was entitled to authorize Luse, Landwehr, and Gonser to record the transaction of June 18.

## C

Knight (but not Messersmith) argues that the authorization granted by Kanekoa on June 26 violated RCW 9.73.230(2)(c). This is true, he says, because the authorization, rather than naming the officers who would intercept and record, listed "all members of the Clark-Skamania

---

[10]Ex. 13 at 2.

[11]Ex. 13 at 2.

Narcotics Task Force." We do not reach this argument, for we have already held that Kanekoa could not grant the requested authorization.[12]

## D

■ Knight and Messersmith argue that the police "failed to scrupulously observe" RCW 9.73.230(4), because they "failed to take any special precautions to insure that 'the recording . . . shall be done in such a manner that protects the recording from editing or other alterations.' "[13] The State responds by saying that it presented evidence showing that each recording was made on a tape not previously used; that it was immediately marked and given to Luse; that he immediately put it into the evidence system of the Clark County Sheriff's Department; and that it was not altered or edited between the date on which it was made and the date of trial. The State argues that this evidence meets the requirements of RCW 9.73.230(4), and we agree.

## E

Knight and Messersmith argue that the State failed to comply with the requirements of RCW 9.73.230(6) or (7)(a). We consider only the June 18 transaction, since the June 26 transaction must be reversed on other grounds.

RCW 9.73.230(6) provides that within fifteen days after the signing of an authorization that results in the interception or recording of a conversation, the law enforcement agency shall submit a report and the original authorization to a judge having jurisdiction. RCW 9.73.230(7)(a) provides that the judge, within two judicial days of receiving these documents, shall determine whether one party consented, whether probable cause existed, and whether a proper report was filled out at the time.

---

[12]We note in passing, however, that Division One has accepted the argument. *State v. Jimenez*, 76 Wn. App. 647, 651, 888 P.2d 744, *review granted*, 126 Wn.2d 1021 (1995).

[13]Br. of Appellants at 43-44.

In this case, Pillsbury signed a written report on June 25, seven days after the June 18 incident. The record does not show whether the report was then submitted to the judge, or whether it remained with Pillsbury for a time. In any event, the judge reviewed it and found probable cause on July 16, eleven days after the latest date on which the report could properly have been reviewed. Knight's and Messersmith's position is that this defect mandates reversal.

 We distinguish compliance with RCW 9.73.230 before privacy is invaded from compliance with RCW 9.73.230 after privacy has been invaded. Before privacy is invaded, strict compliance should be required; without it, privacy might be invaded improperly and the intent of RCW 9.73.230 defeated. *State v. Jimenez*, 76 Wn. App. 647, 651, 888 P.2d 744, *review granted*, 126 Wn.2d 1021 (1995); *State v. Gonzalez*, 71 Wn. App. 715, 718-19, 862 P.2d 598 (1993), *review denied*, 123 Wn.2d 1022 (1994). After privacy has been invaded, however, strict compliance is less important; privacy already invaded cannot be restored, and the rights of the parties can be sorted out in the ordinary course of litigation. Based on these observations, we think that noncompliance with a postinvasion statutory requirement should warrant reversal only if the State fails to show substantial compliance, or the defendant shows prejudice due to the absence of strict compliance.

Here, Pillsbury completed and signed his report on June 25, which was timely. The record is not clear whether he then failed to submit the report to the court in a timely fashion, or whether he submitted the report and the court failed to review it in a timely fashion. In any event, the court reviewed the report eleven days after the latest date on which it should have been reviewed; the court found probable cause; and its finding is not assailed except for tardiness. There is no hint of prejudice resulting from the delay, and it seems clear that the court would have found probable cause in exactly the same way had it reviewed the report eleven days earlier. Under these circumstances,

we think the statute's purpose of insuring a postinvasion judicial review of probable cause was substantially fulfilled; that the State has shown substantial compliance; and that the defendants have not shown prejudice due to the eleven day delay. We decline to reverse due to a lack of strict compliance with RCW 9.73.230(6) or (7)(a).

### III

In their brief, Knight and Messersmith argue that RCW 69.50.435 creates a separate drug offense, as opposed to an enhancement of sentence. They further argue that the State failed to allege or prove that separate offense. After their brief was submitted, the supreme court decided *State v. Silva-Baltazar*, 125 Wn.2d 472, 886 P.2d 138 (1994), and that case resolves the issue adversely to their position.

The conviction based on Knight's Count III is reversed. All other convictions are affirmed. Assuming Knight is not reconvicted on Count III, he is entitled to have the trial court resentence on Counts I and II, using a standard range not affected by Count III.

SEINFELD, C.J., and WIGGINS, J., concur.

Review denied at 129 Wn.2d 1005 (1996).